KELIHER v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. January 12, 1912.)

No. 913.

1. CRIMINAL LAW (§ 1028*)—APPEAL—QUESTIONS REVIEWABLE—QUESTIONS NOT RAISED AT TRIAL.

The rule applied that a question not raised in the trial court will not be reviewed on a writ of error, unless the court's refusal to do so would shock the judicial conscience.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2619; Dec. Dig. § 1028.*]

2. CRIMINAL LAW (§ 857*)—OFFENSES—DATES.

An indictment for aiding and abetting a national bank clerk to misappropriate the bank's funds contained 10 counts, relying on 10 different transactions, giving the date of the first as of December 1, 1909, the second on December 9th, and running through to include December 31st. *Held*, in the absence of a bill of particulars, the jury might select 10 dates out of the whole list of dates involved on which to base a conviction, except as something occurred during the trial to specifically fix the dates.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2054; Dec. Dig. § 857.*]

3. INDICTMENT AND INFORMATION (§ 84*)—AIDING AND ABETTING.

The rule applied that where accused was charged with aiding and abetting a national bank clerk to misappropriate its funds, in violation of Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), it was not necessary that the indictment should allege with particularity the nature of the aid or abetting rendered.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 227, 228; Dec. Dig. § 84.*]

4. BANKS AND BANKING (§ 256*)—NATIONAL BANKS—OFFENSES—"AID OR ABET."

The words "aids or abets," as used in Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), providing that every person who with intent to deprive a national banking association of its funds aids or abets any clerk or agent in any violation of such section shall be guilty of a misdemeanor, are to be construed according to their natural import, and are satisfied by proof that accused actually participated in such misappropriation, and of concurring acts performed by him to that end.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 256.* For other definitions, see Words and Phrases, vol. 1, pp. 291–293.]

5. BANKS AND BANKING (§ 257*)—NATIONAL BANKS—MISAPPROPRIATION OF FUNDS.

Where an indictment for aiding and abetting a national bank clerk to misapply certain of the bank's funds alleged that the clerk was also a depositor, that he obtained possession of the bank's funds by means of overdrafts, and that he neglected to inform the bank's officers thereof, but, instead, secreted the same by false entries, the indictment sufficiently set out the funds were misapplied by the clerk.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 973; Dec. Dig. § 257.*]

6. BANKS AND BANKING (§ 256*)—NATIONAL BANKS—MISAPPROPRIATION OF FUNDS—KNOWLEDGE OF OFFICER.

Where a national bank clerk misappropriated a large amount of the bank's funds by a system of more than 50 overdrafts, and the govern-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ment claimed that accused was an aider and abettor therein, the fact that the bank's officers might have had knowledge of some of the over-drafts did not relieve the transactions of their criminal character.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 964; Dec. Dig. § 256.*]

**7.** CRIMINAL LAW (§ 511*)—ACCOMPLICE TESTIMONY—CORROBORATION.

The rule applied that it is not necessary that an accomplice should be corroborated in every particular in order to sustain a conviction; it being enough, if the corroboration extends to a point sufficient to show that the accomplice has testified truly in some particulars, as to authorize the jury to infer that he has so testified in others.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1127–1137; Dec. Dig. § 511.*]

**8.** CRIMINAL LAW (§ 511*)—CORROBORATION OF ACCOMPLICE.

In a prosecution for aiding and abetting a national bank clerk to mis-appropriate the bank's funds in violation of Rev. St. § 5209, evidence *held* to constitute sufficient corroboration of the clerk to sustain a con-viction against accused.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 511.*]

**9.** CRIMINAL LAW (§ 80*)—AIDING AND ABETTING—NATIONAL BANK FUNDS —MISAPPROPRIATION—MODUS OPERANDI—KNOWLEDGE.

In a prosecution of accused for aiding and abetting a national bank clerk to misappropriate its funds in violation of Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), it was not necessary to sustain a conviction of defendant that the United States prove that he knew the clerk's modus operandi in obtaining the funds.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 103–111; Dec. Dig. § 80.*]

**10.** CRIMINAL LAW (§ 422*)—DECLARATIONS—RES GESTÆ.

Where, in a prosecution of defendant for aiding and abetting a na-tional bank clerk to misappropriate the bank's funds, the government claimed that the clerk took funds from the bank, and that accused went to New York where he intrusted the money to accused, with which to engage in gambling, evidence that, instantly and during the interview, after the clerk had given certain of the money to accused, he turned to witness, and said, "There goes $3,000," was admissible as res gestæ, though it did not appear that the statement was heard by accused.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 984–988; Dec. Dig. § 422.*]

**11.** BANKS AND BANKING (§ 256*)—NATIONAL BANKS—MISAPPROPRIATION OF FUNDS—AIDING AND ABETTING.

Where accused, with knowledge that a national bank clerk had mis-appropriated certain of the bank's funds, actually accepted into his own hand what he knew to be moneys of the bank, and used or pretended to use the same for the clerk in gambling, he was guilty of aiding and abetting the clerk, in violation of Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), he shall be guilty of a misdemeanor.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 958–964, 967; Dec. Dig. § 256.*]

**12.** CRIMINAL LAW (§ 921*)—APPEAL AND ERROR—RULINGS ON EVIDENCE—PREJUDICE.

The erroneous admission of evidence over objection not properly taken does not entitle accused to a new trial, unless the error complained of could not have been prejudicial.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2206–2209; Dec. Dig. § 921.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

13. WITNESSES (§ 352*)—CREDIBILITY—ATTACK.
      The credibility of a witness cannot be attacked unless on cross-examination by independent proof of his connection with an alleged fake gambling resort.

      [Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 1152; Dec. Dig. § 352.*]

14. WITNESSES (§ 48*)—COMPETENCY—CONVICTION OF MISDEMEANOR.
      *Held,* that a conviction under Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), does not disqualify the person convicted to testify as a witness.

      [Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 109–115; Dec. Dig. § 48.*]

In Error to the Circuit Court of the United States for the District of Massachusetts.

William J. Keliher was convicted of aiding and abetting a national bank clerk in misapplying the bank's funds in violation of Rev. St. U. S. § 5209, and he brings error. Affirmed.

Daniel H. Coakley and Harvey H. Pratt, for plaintiff in error.

Asa P. French, U. S. Atty., and William H. Garland, Asst. U. S. Atty.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This appeal has been delayed in an extraordinary manner by circumstances beyond the control of the court. It was first argued in January, 1911. The case was a long time on trial; the record showing that at least 120 witnesses were called, and many important questions were raised. On motions pro and con we permitted the filing of several supplemental briefs, which were not all in until near the close of February, 1911. Within two weeks after the last brief was filed, one of the judges who sat at the hearing deceased. Reargument having thereupon been ordered, one of the judges before whom the case was pending succumbed to a long illness.

[1] Before taking up this particular case, we desire to call attention to the fact that this court is firmly, consistently, and steadily governed by two propositions of very great importance with reference to diminishing the number of new trials which ought to have been avoided. First of all, we recognize the fact that, not only is this court an appellate tribunal in form, but likewise the same in substance and in truth; so that ordinarily we refuse to consider any proposition which was not presented to the court of first instance unless such refusal would shock the judicial conscience. Such are cases grouped with a somewhat careless expression to the effect that, whatever the rules of practice are, plain errors may well be considered. Especially may this happen in criminal cases. Crawford v. United States, 212 U. S. 183, 29 Sup. Ct. 260, 53 L. Ed. 465. The second proposition is that only in the rarest instances should an appellate court consider propositions which were not brought to the court of first instance, and which might have been met and disposed of satisfactorily if seasonably presented

during the nisi prius proceedings. Some of these instances may at times be adjudicated on the theory of laches or waiver; and sometimes it may be difficult to say from which view they should be considered.

One Coleman, who was a clerk in the National City Bank of Cambridge—that is, a bookkeeper there, as well as a depositor—had, by a system of what may be called overdrafts, defrauded the bank of over $200,000 by various transactions commencing so far as this record is concerned in June, 1909, and ending in December, 1909, the whole number of transactions shown by the record being about 50, and for amounts varying between $1,000 and $6,000. Thereupon Keliher, the plaintiff in error, was indicted for aiding or abetting Coleman, under section 5209 of the Revised Statutes (U. S. Comp. St. 1901, p. 3497); the portions thereof which the United States rely on being as follows:

"Every * * * clerk or agent of any association who embezzles, abstracts, or willfully misapplies any of the moneys, funds or credits of the association * * * with intent * * * to injure or defraud the association * * * and every person who, with like intent, aids or abets any * * * clerk or agent in any violation of this section, shall be deemed guilty of a misdemeanor, and shall be imprisoned not less than five years nor more than ten."

Coleman had been convicted and sentenced; but, of course, in the present case, it was necessary to allege and prove sufficient facts to support anew that conviction.

[2] The indictment takes up only 10 of these 50 transactions, having only 10 counts, giving the first as of December 6, 1909, making the second transaction December 9th, and running through to include December 31st. There were some transactions after December 31st—that is, in January, 1910—which were not relied on in this proceeding; because, if they had been prosecuted, they would have been justiciable under the Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1088 [U. S. Comp. St. Supp. 1909, p. 1391]), which became effective as of January 1, 1910, and which rendered these offenses, after it became effective, felonies; while under the Revised Statutes, before the Penal Code become effective, they were misdemeanors. Of course, the two classes could not be joined in the same indictment. The evidence apparently concerned itself with only two dates given in the scheduled transactions, namely, June 2d and November 27th. These dates may be referred to again specifically, but subject to the following observations: No bill of particulars was asked for, so that, unless something occurred during the trial to specifically fix dates, it was for the United States, down to the time of sending the case to the jury, to select at its option ten dates out of the whole list of dates involved.

According to strict rules of procedure, the United States should have selected certain specific transactions, proving the dates selected; and should have identified the plaintiff in error with some or all those specific transactions, following them through the proceedings in the usual methods of identification from beginning to end. This, how-

ever, was not attempted, so far as we can discover. The United States assert that they introduced evidence tending to show that the plaintiff in error was not only connected specifically with one or more misapplications charged in the indictment, but, also, generally with all the funds dishonestly abstracted by Coleman, on the ground that substantially all the money thus abstracted entered the pockets of the plaintiff in error, or those of his alleged associates. Therefore the United States proved by Coleman, apparently without objection, that he misapplied approximately $211,000 on and after the 2d day of June, 1909, and that of this amount all but a sum not exceeding in the whole $50,000 was lost through his connection with the plaintiff in error. Therefore, as to this, the case in these aspects comes before us subject to the two propositions which we stated at the start of this opinion, leaving us open to examine all the transactions between Coleman and the plaintiff in error as was done in the Circuit Court, and leaving us to find that the United States and the court which imposed a penalty covering at least two transactions were at liberty, so far as this record is concerned, and notwithstanding there were only ten counts, to single out, even at the last moment, specific transactions sufficient to sustain the sentence, disregarding any particular date whatever, unless perhaps November 27, 1909. In short, in these particulars the case was left at large; so that we cannot, by reason of anything that we have stated, reverse the judgment, although we cannot put our finger on any specific date or any specific transaction, unless possibly it may be the one to which we have referred.

Some questions are raised on the face of the indictment; and therefore we insert here in full the first count, which is a sample of all the counts, as we understand them:

"First Count. The jurors for the United States of America within and for the district of Massachusetts, upon their oath, present that before and at the time of the commission of the offenses hereinafter in the several counts of this indictment charged the National City Bank of Cambridge was a national banking association, duly organized and existing under the laws of the United States, and having its usual place of business at Cambridge, in said district, and said the National City Bank of Cambridge on the sixth day of December, in the year nineteen hundred and nine, had an account and credit to the amount and of the value of thirty-five hundred dollars with the National Shawmut Bank of Boston; that before and at the time of the commission of the offenses hereinafter in the several counts of this indictment charged one George W. Coleman of said Cambridge was a clerk, to wit, bookkeeper, of said the National City Bank of Cambridge, and had an account with said the National City Bank of Cambridge as a depositor thereof; that said George W. Coleman, such clerk as aforesaid, on the sixth day of December, at said Cambridge, with intent to injure and defraud said the National City Bank of Cambridge, unlawfully, knowingly, and willfully did misapply said credit of said the National City Bank of Cambridge to the payment of a certain check theretofore, to wit, on the fourth day of said December, made and signed by said Coleman, drawn on said the National City Bank of Cambridge to the order of J. Thomas Reinhardt, for the sum of thirty-five hundred dollars, a more particular description of said check being to the grand jurors unknown, which said check when paid by said the National City Bank of Cambridge in the ordinary course of business would be chargeable against said Coleman's said account; that said Coleman's credit with said the National City Bank of Cambridge was not on

said sixth day of December of the amount or value of thirty-five hundred dollars, but was much less, and said Coleman did not then or thereafter deposit to the credit of his said account with said the National City Bank of Cambridge sufficient money, funds, or credits to increase his said credit to the amount or value of thirty-five hundred dollars; that said check was thereafter indorsed by said Reinhardt and deposited for collection to the account of said Reinhardt in the National Union Bank of Boston, and said check in the ordinary course of business came into the possession of the Boston Clearing House Association for collection, and by said Boston Clearing House Association was on said sixth day of December presented to said the National City Bank of Cambridge for payment; that said Coleman, well knowing all the premises, on said sixth day of December, knowingly and fraudulently did fail and neglect to inform said the National City Bank of Cambridge, or the proper officer thereof, that his, said Coleman's, said credit was not then of the amount or value of thirty-five hundred dollars as aforesaid, and that payment of said check should, in accordance with the custom of said the National City Bank of Cambridge, be refused by said the National City Bank of Cambridge because of insufficient funds to the credit of the drawer of said check, to wit, said Coleman, but, on the contrary, said Coleman knowingly and fraudulently did cause said credit of said the National City Bank of Cambridge to be transferred by said the National City Bank of Cambridge to said Boston Clearing House Association in payment of said check, he, said Coleman, intending by the means aforesaid knowingly and fraudulently to deprive said the National City Bank of Cambridge of its said credit to the amount and value aforesaid, and thereby to convert the same to his, said Coleman's, own use and benefit.

"And the jurors aforesaid, upon their oath aforesaid, do further present that one William J. Keliher of Winthrop, in said district, well knowing the premises, on said sixth day of December, at said Cambridge, unlawfully, knowingly, and willfully, and with intent to injure and defraud said the National City Bank of Cambridge, did aid and abet said Coleman, such clerk as aforesaid, the said offense in manner and form aforesaid to do and commit."

[3] Several propositions arising on this indictment are settled by the Supreme Court in Coffin v. United States, 156 U. S. 432, 15 Sup. Ct. 394, 39 L. Ed. 481, namely: That, inasmuch as Coleman was a clerk, or, in a certain sense, an agent of the bank, the statute in question extends to the plaintiff in error, who was neither; also that on an indictment of this character it is not necessary to state with any great particularity the nature of the aid or abetting rendered.

[4] The plaintiff in error undertakes to limit the meaning of the words "aids or abets." The decisions as to the statutory effect of these words are not consistent or always satisfactory. They are often complicated, in that they explain in connection with technical rules as to accomplices in felonies. It is true they are not so broad as the words "aids, abets, counsels, commands, induces or procures" found in section 332 of the Penal Code of March 4, 1909, already referred to, and it is also true that they apparently render necessary some concrete act; but there is no reason in the context of the section of the Revised Statutes under consideration, and no persuasive reason in any decision or textwriter which we have found, which requires us to give here to the words anything less than their natural import. Their practical intent as applied to this indictment will be found as we proceed to the consideration of the facts offered in evidence pro and con; and it will thus be found that their intent is sufficient so far as this proceeding is concerned.

[5] The plaintiff in error makes some sweeping criticisms of the indictment which we do not think we need particularly refer to. He claims that the indictment nowhere sets out the manner in which the funds of the bank were misapplied by Coleman. We have no doubt that this criticism is suggested rather by redundancy than by any deficiency in its allegations. It is to be borne in mind that the indictment alleges that Coleman was not only a clerk but a depositor; and it is by virtue of the fact that he thus occupied a double position that he was able to complete the frauds on which these proceedings are based. We call specific attention to the fact that the basis of the indictment is overdrafts by Coleman as a depositor, and also that he as bookkeeper knowingly and fraudulently neglected to inform the proper officers of the institution in regard to the overdrafts. The indictment does not specifically allege that it was his duty to give such information; but this duty is sufficiently covered by the words "fraudulently" and "neglect," which inevitably imply a duty on his part to inform, a duty which is also inevitably implied from his relation of bookkeeper. The transactions were accomplished through checks on the bank, given by Coleman to the order of one Reinhardt, which came into the bank through the Clearing House, which checks were not entered up on its account books, but were taken and secreted by Coleman; the whole being accompanied with entries made by him on the accounts of other depositors which enabled him to bring out his trial balance. The indictment is complicated by the allegations that the bank in question had credits of certain amounts named with the National Shawmut Bank, and that Coleman did misapply these credits in the way stated, namely, that the checks came in the usual way through the Clearing House back to Coleman as bookkeeper, as the indictment points out; so that through the operation of the Clearing House the bank in question here was deprived of the amounts due from the National Shawmut Bank, and its credits there were applied to the benefit of Coleman. To explain these complicated transactions simply: If Reinhardt had produced Coleman's checks at the counter of the bank in question here, and the paying teller had paid them in bills, and passed them over to Coleman as bookkeeper to be entered up, and they had been entered up in the regular way, Coleman would have stood, under the circumstances alleged, as having openly overdrawn his account. A single transaction of that character, if disclosed, would, of course, not necessarily or even presumably have involved a criminal intent or act, as he might have had credit with his own bank for the amount of any particular check; but, by not entering the checks on the books of the bank, and by concealing them from the officers of the bank, he would have shown a fraudulent intention to abstract the amounts of the checks from the funds of the bank which would render him criminally liable. The substance of the transactions as they appear on the face of the indictment, though they traveled a long road, was the same as what we thus describe.

[6] We think we have thus disposed of all the substantial objections to the indictment, or to the application of the statute under the circumstances alleged in it; but in this connection it is convenient to refer to a proposition made by the plaintiff in error to the effect that

there was evidence that the transactions of Coleman were known to the responsible officers of the bank, and therefore that they could not be criminal. It is true that, if there had been only one or two transactions of the character involved, whether in the simple form which we have described or in the form in which the transactions actually occurred, knowledge of the officers of the bank and their acquiescence might, as we have said, have sufficiently established the fact that an amount of credit was given to Coleman which would neutralize any charge of a penal character; but where the transactions were so numerous as appeared here, and were of so large a gross amount as to wreck the bank, as the record shows they were, and were in connection with a bookkeeper of no substantial means and earning only a small salary, the entire mass, even if shown to have been known to the responsible officers of the bank, would necessarily have imputed such an unauthorized absorption of its assets by Coleman as to involve a degree of guilt which, according to the well-settled rules of law, apparently not understood by the plaintiff in error, would not have excused Coleman even if the transactions were accompanied with the connivance or indifference or negligence of the responsible officers, a rule of law applying not only to criminal proceedings, but even to a suit brought by a bank on a fidelity bond. The learned judge who tried the case in the Circuit Court observed that there was no evidence supporting any proposition of this nature; but, in any view, what we have observed disposes of the plaintiff in error's assignments numbered 17, 18, 19, 20, and 21.

[7] The testimony of Coleman, if accepted by the jury, covered every point necessary to make out a case against the plaintiff in error. What else we have to discuss further relates only to corroboration. The rules as to corroboration are fully stated in Roscoe's Criminal Evidence (13th Eng. Ed. 1908), at pages 110 and 111. So far as the general rules of English criminal law are concerned, there is no better authority than Roscoe to the extent to which he discusses them. At the closing of his observations he cites two decisions, but he adds:

"It is not necessary that the accomplice should be corroborated in every particular, for then his testimony would be superfluous; but there must be a sufficient amount of confirmation to satisfy the jury of the truth of his story."

Plainly this is the result of his summing up of the law, notwithstanding he refers to two decided cases, as we have said. Of course, it is settled that, as this case was tried in the District of Massachusetts, the law of Massachusetts as it stood at the time of the Revolution is ordinarily followed in this district in federal courts, notwithstanding the United States statutes on this topic do not reach criminal proceedings. It is well known that the rule in Massachusetts has always been as stated by Roscoe. It is not necessary to indulge in a long explanation of this proposition, or to do more than refer to what was said in the opinion of Mr. Justice Morton in behalf of the Supreme Judicial Court in Commonwealth v. Bosworth, 22 Pick. 397, 399, decided in 1839. There it was said that "it is perfectly clear that it" —that is, the corroboration—"need not extend to the whole testimony,

but, it being shown that the accomplice has testified truly in some particulars, the jury may infer that he has in others." The opinion adds, of course, that the corroborative evidence must relate to portions of the testimony material to the issue.

[8, 9] The corroboration here is of a most efficient character. The theory of the United States is that the great bulk of the money, to the amount already stated, of which Coleman defrauded the bank, was lost in what was gambling in the city of New York, or what the United States claims may have been a mere pretense of gambling, or so-called "fake gambling," to the extent that Coleman believed he was losing at gambling when in fact he was not, but had been merely defrauded. It is also the theory of the United States that this gambling was done in company with the plaintiff in error and, after the early periods, through him; and that Coleman and the plaintiff in error went frequently to New York for the purpose of gambling, going generally on the afternoon train and returning on the midnight train. This was all testified to by Coleman. It was also the theory of the United States that Coleman and the plaintiff in error were very much together at Boston, though there was no evidence of any gambling in that city. It cannot be doubted that, on account of the unquestioned intimacy between the plaintiff in error and Coleman, the plaintiff in error must have known that Coleman had no resources covering such large amounts of money except what he could plunder from the bank; and Coleman testified expressly that he informed the plaintiff in error some time in December of that fact. Lockhart testified to at least one conference between Coleman and the plaintiff in error at the bank. Also by his testimony he showed their intimacy otherwise; and especially he showed that on the day when Coleman absconded to the West and for a while disappeared, which was on February 18, 1910, the plaintiff in error was with Coleman at the Lenox Hotel in Boston until the time for the departure of the train late in the evening; that the plaintiff in error paid Coleman's bill at the hotel, and accompanied him to the station; that the plaintiff in error not only paid Coleman's bill, but gave him $100; that on February 23d Lockhart telephoned the plaintiff in error that the bank had closed, and that Coleman was being sought for by the bank on account of the shortage in the bank's funds; that thereupon the plaintiff in error telephoned Lockhart to meet him at the Copley Square Hotel, which he did; that he then showed the plaintiff in error a newspaper containing an account of Coleman's leaving the bank; that the plaintiff in error told him that Coleman had said that his father had given him money, but that he told Lockhart to keep quiet, and not talk too much, and accompanied him to a building on Huntington avenue, where he gave him $10; and that later he was introduced by the plaintiff in error to a man by the name of Cronin, whom the plaintiff in error said he had engaged as counsel for Coleman; and that when Coleman returned to Boston he (Lockhart) accompanied Cronin to the railroad station to meet Coleman. It was in evidence that at this time Coleman was an absconder whose whereabouts were generally unknown. It was also shown that on February 21st the plaintiff in error appeared un-

der the name of John Marshall at the office of the Western Union and transferred $200, payable nominally to G. W. McTaggart, Kansas City, and paid the charge for sending the same, as well as the amount of the transfer, signing an application "John Marshall, 30 Huntington avenue." Kansas City was where. Coleman was, so it appeared that the plaintiff in error had confidential information as to Coleman's whereabouts. All this sufficiently corroborated the fact of knowledge by the plaintiff in error of the criminality of Coleman's proceedings, and of every essential fact relating to Coleman's crime. We will add that it is fundamental that the United States were not required to prove that the plaintiff in error knew Coleman's modus operandi.

Other witnesses testified to seeing occasionally the plaintiff in error and Coleman leaving for New York on the afternoon train to which we have referred, thus affording another important link in the chain of corroboration. No corroboration appears in the record with reference to what occurred in New York until Lockhart appeared in New York as Coleman's friend. According to Coleman's story, at the time Lockhart was at New York, Coleman, as we have said, had for a long time ceased to gamble with his own hand, and was doing his gambling through the plaintiff in error; one transaction testified to by Coleman being given in substance by Lockhart with reference to the date of November 27, 1909. The plaintiff in error objected to evidence concerning that date, because the dates alleged in the various counts in the indictment were all in December; but, as we have already said, according to the usual rule, the United States had not tied themselves to any particular date, unless, when introducing Lockhart's evidence, they tied themselves to this date of November 27th, and had by other evidence, which we need not detail, tied themselves to June 2, 1909. Whether or not the United States were tied' to the date November 27th, as establishing a specific date covered by the indictment, is, moreover, not important for the purpose for which we are using Lockhart's testimony; that is, as to the matter of corroboration alone. On a question whether parties have traveled a certain path which they themselves have made, the fact that they were traveling it on a certain day affords a presumption that they may have traveled it at a somewhat earlier date sufficient for a matter of corroboration.

The whole story as told by Lockhart with reference to his visit to New York has on its face the appearance beyond question of a repetition of like previous visits, at least sufficiently so for purposes of corroboration. Lockhart was the man who ordinarily went to Reinhardt for the purpose of kiting checks between him and Coleman, and he testified to the belief that he in that way obtained $3,000 on the morning of the very day in question, November. 27th. The schedule, however, to which we have referred, makes the transaction on that date $5,000. As Lockhart's testimony is not questioned except as to the amount, which is not of importance, whether $3,000 or $5,000, this possible discrepancy does not affect it. He says he went to New York that day with Coleman at 5 o'clock on the afternoon train, and that on arrival at New York the plaintiff in error met him at the station, and all three went to the Hotel Belmont; that there in the café

Coleman and the plaintiff in error withdrew from him, and conversed with each other; that he did not hear what was said; that he saw money in the form of bills passing from Coleman to the plaintiff in error, but that he could not tell the denomination or how many bills there were; that, when Coleman passed the bills to the plaintiff in error, Coleman turned towards the witness, and said, though not perhaps so as to be heard by the plaintiff in error, "There goes three thousand"; that the plaintiff in error then went out, and that the three met again about an hour afterwards at the same Hotel Belmont; that Coleman and the plaintiff in error went outside of the hotel, where they conversed, and that the witness heard part of the conversation, which used the word "Jack" and also the words "lost the money"; and that thereupon Coleman swore. "Jack" was the ordinary name of a man known as Jack Leonard, and perhaps also known as Walsh, who resided in New York, but with whom Coleman had gambled before he met the plaintiff in error, and who introduced the plaintiff in error to him on Boston Common. Taking it all together, there can be no question that the jury might well find from this sufficient corroboration of the evidence of Coleman that Coleman was gambling, or believed he was gambling, in company with the plaintiff in error, and that he had been passing money to the plaintiff in error for that purpose to a very considerable extent.

[10] It is true that the plaintiff in error objected to the testimony as to Coleman's statement to the witness, "There goes three thousand," because it did not appear to have been heard by the plaintiff in error, and also, as we have said, because this occurred on November 27th, while the first date alleged in the indictment was in December. The objection with reference to the date we have already met, and the other objection is met by the rules as to res gestæ. What was said by Coleman was not a subsequent statement in any sense of the word, so as to be a mere matter of res inter alios, but was an exclamation accompanying the act, and was clearly within the rule as to res gestæ as stated in St. Clair v. United States, 154 U. S. 134, 149, 14 Sup. Ct. 1002, 1008 (38 L. Ed. 936), as follows:

"Circumstances attending a particular transaction under investigation by a jury, if so interwoven with each other and with the principal fact that they cannot well be separated without depriving the jury of proof that is essential in order to reach a just conclusion, are admissible in evidence. * * * 'The res gestæ,' Wharton said, 'may be, therefore, defined as those circumstances which are the undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist of speeches of any one concerned, whether participant or bystander. They may comprise things left undone as well as things done. Their sole distinguishing feature is that they should be the necessary incidents of the litigated act; necessary in this sense, that they are part of the immediate preparations for or emanations of such act, and are not produced by the calculating policy of the actors. In other words, they must stand in immediate casual relation to the act—a relation not broken by the interposition of voluntary individual wariness seeking to manufacture evidence for itself. Incidents that are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act.'"

[11] In this way we have untainted evidence as to the facts involved in the alleged guilt of the plaintiff in error as stated in Coleman's testimony, sufficient corroboration of all the essential elements; that is, of knowledge of Coleman's crime and of active co-operation in enabling Coleman to dispose of the funds abstracted from the bank, whether the plaintiff in error was actually gambling or only assuming to be gambling, and in this respect committing a fraud on Coleman as well as joining in his guilt. In any view, he stood in essence as a receiver of stolen goods, or of one who goes with a thief carrying stolen goods to a person who will purchase them, making an introduction for the purpose of a sale, with knowledge that the goods were stolen. Here we have actual participation, and concrete acts, which satisfy the words "aids or abets" in any fair sense thereof. If necessary to put the nature of the crime of the plaintiff in error beyond all possible question, it is to be borne in mind that the moneys which Coleman delivered to him from time to time were at the time of each delivery still the property of the bank, as the method by which they had been obtained had not extinguished its title. Therefore it goes so far in the way of aiding and abetting that the plaintiff in error, with knowledge of guilt, actually accepted into his own hand what he knew, or must have known, to be still the moneys of the bank; so that the part performed by him was as positive and as concrete as though he had attended at the bank, and assisted in counting out of its till the bills which Coleman received.

So far, the United States proceeded on safe ground. Now we come to the part of the case which presents more difficulty, and where we must apply the second proposition with which we commenced this opinion. There is no evidence in the case to the effect that the plaintiff in error disposed of any funds received from Coleman at any place at Boston in gambling or otherwise. Nevertheless there was a very considerable amount of evidence put into the case in reference to who frequented the places described as 30 Huntington avenue, 8 Beacon street, and 110 State street. It was shown that the plaintiff in error was occasionally present at each of these places, and especially at 30 Huntington avenue, where the transactions with him under the name of Marshall with reference to remitting funds to Kansas City had full connection with Coleman's guilt at one end. The evidence in reference to 8 Beacon street seems to have been wholly immaterial, and we need not consider it any further; but the evidence in relation to 110 State street was of a prejudicial character. Although, as we have said, there was no proof of any transactions there with Coleman, yet there was evidence that the plaintiff in error had, to a certain extent, control over the place, either wholly or partially; and what was prejudicial was evidence that it was an establishment for fake gambling in connection at least with horse racing. The proofs showed that there was in this office a telegraph instrument which had no connections, though apparently it had such over which messages might be apparently received and sent, for the purpose of deceiving innocent persons who wandered in. Of course, in a case which was otherwise close, the connection of the plaintiff in error with an establishment of

that character would be more scandalous than the fact that he was a gambler.

In discussing this evidence, the United States maintain that they searched the record in vain for any instructions that the jury should consider the conduct of the men who resorted to the places referred to as evidence tending to show the guilt of the plaintiff in error; and then they rehearse what was true, that the court told the jury in the most emphatic manner that all the testimony with reference to what occurred there, and who resorted there, while it was competent, should have little or no weight in the minds of the jury, and reiterated in strong language that, after all, it was the guilt of the plaintiff in error in respect to the matters alleged in the indictment which they were to determine, and not the guilt of any other persons named. Indeed, it is pressed on us now in various forms, though not perhaps directly, that this evidence was not prejudicial; but it is not gracious for the party who during a trial presses in, and under full and earnest objections, proofs of any kind, to afterwards turn about in the appellate court and claim they were not material. Of course, in a long trial like this, where it is said 120 witnesses were called, things may occur incidentally, and without full discussion and inadvertently, which subsequent instructions of the court render to a large degree or wholly immaterial, and which could not be allowed to disturb the verdict; but the case here is not of that kind, and we are bound to accept, from the persistency maintained by the United States at the trial, that this evidence was in its nature of a prejudicial character; and the court left the evidence in the case.

[12] It is true that the entire case as developed impresses us with the view that, aside from the evidence we are now considering, the jury would have found the plaintiff in error guilty; but for an appellate court to dispose of a question of this character in that way is dangerous, and assumes to perform the duties of the jury, from whom the parties are entitled to a verdict under correct instructions from the court as to the law, and might unwittingly do great injustice. The rule that under such circumstances a new trial shall be directed unless the error complained of could not have prejudiced the parties has been firmly applied in Vicksburg & Meridian Railroad v. O'Brien, 119 U. S. 99, 103, 7 Sup. Ct. 118, 30 L. Ed. 299, and several other cases, many of which are summed up by the Circuit Court of Appeals for the Sixth Circuit in Inman Bros. v. Dudley Lumber Co., 146 Fed. 449, 455, 76 C. C. A. 659. The last statement of this rule of the Supreme Court was in Crawford v. United States, 212 U. S. 183, 205, 29 Sup. Ct. 260, 53 L. Ed. 465. However, the second proposition with which we opened this opinion meets the difficulty here.

[13] The evidence was admitted apparently on two grounds. One was that it affected the credibility of the witnesses. We are unable to see that it affected the credibility of any witness called here in any legitimate way. The rule is too well settled that a witness is not to be attacked in this manner, unless on cross-examination, to be disregarded or glossed over by us. This proof, however, was admitted mainly on the theory of the United States that the plaintiff in error

was only one of a number of conspirators who had united to plunder the bank with Coleman. This is put in various ways. The position of the United States on this point is finally stated in the following manner:

"The evidence in this case disclosed a startling crime committed under most extraordinary circumstances. The burden upon the prosecution was not an easy one. It was to demonstrate to the satisfaction of a jury beyond a reasonable doubt that Keliher was one of the instruments, and, so far as the charges in this indictment are concerned, the principal instrument, operating through whom a band of swindlers got possession of the assets of a national bank by tempting and persuading one of its clerks, in effect, to steal for their benefit. If the government's theory is correct, it was the audacious scheme of desperate men skillfully and successfully executed, with all possible precaution to prevent the detection of the accessories and confederates. The government undertook to prove, and did prove to the satisfaction of the jury, the existence of such a gang, the character of some of the enterprises in which it was engaged, and Keliher's connection with it."

At the trial, in urging the admission of this evidence, referring to one of the men who resorted to these places, the learned attorney for the United States said: "We have connected Walsh over and over again with Keliher in this scheme. It is for the jury to say what scheme." Thereupon the learned judge said that it seemed to him there was enough to go to the jury. Also, during the trial, with reference to this evidence that we are discussing, both the learned counsel for the United States and the court used not only the words "band" and "scheme," but the word "gang," an injurious word of common understanding, but of no definite meaning in the law. Three times the United States have submitted to us their views with reference to the admissibility of this evidence, but we must say that this whole line of proof was of a nebulous character from whatever point examined. In fact, the learned judge who tried the case apparently expressed himself in that direction, and regarded the deductions from the evidence on this proposition as at the best inferential; yet the trial was apparently allowed to drift, and to go along with the continued development of that theory on behalf of the United States. Bearing in mind the protracted character of the trial, as shown by the number of witnesses stated by us, it was the duty of the plaintiff in error, if he objected to this entire element in the trial on the grounds we have suggested, to have put it to the court positively and pointedly, because in a trial of that character it is unjust to assume that the court has all the elements before it at all times. Consequently we must assume that the case went on with the attempt on the part of the United States to develop the theory of a combination in the manner we have described, having for its object the plundering of the bank through Coleman. Under such circumstances, a large margin of discretion is given to a judge of a court of first instance. We cannot describe the extent of this discretion any better than by quoting from Clune v. United States, 159 U. S. 590, 592, 593, 16 Sup. Ct. 125, 126 (40 L. Ed. 269), as follows:

"Although all the evidence does not appear to have been preserved in this bill of exceptions, enough is disclosed to show that the government was seeking to establish a conspiracy by circumstantial testimony, and telegrams of

this character, if identified and brought home to the defendants, were obviously circumstances tending to show such conspiracy. It is familiar law that, where a case rests upon that character of evidence, much discretion is left to the trial court, and its ruling will be sustained if the testimony which is admitted tends even remotely to establish the ultimate fact. Alexander v. United States, 138 U. S. 353 [11 Sup. Ct. 350, 34 L. Ed. 954]; Holmes v. Goldsmith. 147 U. S. 150 [13 Sup. Ct. 288, 37 L. Ed. 118]; Moore v. United States, 150 U. S. 57 [14 Sup. Ct. 26, 37 L. Ed. 996]; Thiede v. Utah Territory, 159 U. S. 510 [16 Sup. Ct. 62, 40 L. Ed. 237]. There was no error in admitting these telegrams."

And, again, we cite on the same proposition from Thiede v. Utah Territory, 159 U. S. 510, 518, 16 Sup. Ct. 62, 65 (40 L. Ed. 237), what was there repeated from a former decision, as follows:

"As has been frequently said, great latitude is allowed in the reception of circumstantial evidence, the aid of which is constantly required, and therefore, where direct evidence of the fact is wanting, the more the jury can see of the surrounding facts and circumstances the more correct their judgment is likely to be."

Therefore, in view of the fact that, like many other illegal combinations, the existence of the combination claimed here by the United States could presumably be proved only by the class of evidence referred to in our citations from the decisions of the Supreme Court, it cannot be denied that, so long as the United States was allowed to proceed with the particular theory of a combination which we have described, the fact that these three places at Boston were maintained by the various parties claimed to be thus in combination with the plaintiff in error, connected with the further fact that he was sometimes found at all these various places, had some tendency to prove the claim of the prosecuting officer, and was within the control of the trial judge in the manner pointed out by these citations.

It is true at the close of the charge the plaintiff in error called the attention of the court to an alleged fact that the court authorized the jury to consider the conduct of various persons in and about the localities referred to as evidence of the guilt of the plaintiff in error; and he then requested the court to withdraw those portions of the charge on the ground that they were erroneous in that the court, by the language referred to, instructed the jury generally that the plaintiff in error might be found guilty of the crime charged by proof of the conduct of others with regard to other matters, who were not indicted, or before the court, in connection with or relating to any act or acts covered by the indictment. This exception to the charge does not reach the proposition we are discussing. That could have been reached only by a positive request of the character we have described, while what we have now referred to was not in any way supported, because the court in no proper sense instructed the jury that the plaintiff in error could be found guilty by reason of the proof of the conduct of others. On the other hand, as we have said, the court distinctly and forcibly instructed the jury that it had only one question before it, and that was whether or not the plaintiff in error was guilty; and that they were not to be led away by other issues, but would direct their attention primarily and carefully to the one question of the

guilt or innocence of the then defendant. Therefore, not only was the exception of the plaintiff in error to which we refer in no way responsive to the charge, and not only not adapted to lead the court to the true issue, but it failed in all respects to point it out to the court, and to inform the United States of the position of the then defendant in reference thereto. In this respect it entirely failed of meeting the second of the propositions with which we commenced this opinion, because non constat, if at the end of this long trial the court had had its attention explicitly and clearly brought to the true issue, that the result would have been an opportunity for the court to make a positive and clear ruling one way or the other, which in one direction would have relieved the record from what we are now considering, or in the other direction would have enabled the United States to improve in some way the nebulous and uncertain condition of the case in the respect which we have pointed out.

A complaint is made in reference to the instruction of the learned judge at the trial as to the application of the rule in regard to the presumption of innocence in criminal cases. He gave the instruction in the terms commonly used; and we may say, so far as we know, universally used until the opinion rendered in behalf of the Supreme Court in Coffin v. United States, 156 U. S. 432, 458, 459, 15 Sup. Ct. 394, 39 L. Ed. 481. The plaintiff in error made a request for instructions evidently following the phraseology of this opinion; but that phraseology was only currente calamo, and did not assume to fix a rule to guide the trial judge. The case turned on the simple fact that no ruling with reference to this presumption had been given at all. Any doubt or confusion which arose from the opinion in Coffin v. United States was directly met and obviated by the determination of the court in Holt v. United States, 218 U. S. 253, 31 Sup. Ct. 2, 54 L. Ed. 1021. There the instruction on this point was given in precisely the same manner as given here, and the phraseology found in Coffin v. United States was rejected, so far as using it in a charge was concerned, on the ground that it might be misleading.

[14] Coleman had been thus convicted of a misdemeanor which subjected him to imprisonment for more than a year; and within the decisions of the Supreme Court of the United States his offense should be regarded as an infamous crime of the character to be proceeded against only by indictment within the language of the Constitution. He was objected to as disqualified from being a witness by that conviction; but the rule always practised and recognized by the courts in this jurisdiction is that stated in 1 Greenleaf's Evidence, 372 and 373. In some late editions of Greenleaf the most essential part of these sections has been dislocated and published in an appendix, so that on a careless reading the full law is not at once perceived. The rule, however, has been so often stated that it is enough to say that a conviction of the character which occurred here is not within the enumeration of treason, felony, or crimen falsi, as defined by the authorities. The general rule is stated in Ex parte Wilson, 114 U. S. 417, 422, 423, 5 Sup. Ct. 935, 29 L. Ed. 89; but we believe it has never been expressly adopted by the Supreme Court. This rule

is applied, but not challenged or considered, in Crawford v. United States, 212 U. S. 183, 29 Sup. Ct. 260, 53 L. Ed. 465.

There are other propositions raised by the plaintiff in error which are disposed of by the considerations we have already stated, or are so obviously immaterial that we need not discuss them specifically.

The judgment of the Circuit Court is affirmed.