DRESSER v. BATES. GALE et al. v. SAME. BUNKER et al. v. SAME.

(Circuit Court of Appeals, First Circuit. March 5, 1918. On Motion to Amend Decree, April 8, 1918.)

Nos. 1265–1267.

1. EQUITY ⬅️410(7)—FINDINGS OF MASTER—PRESUMPTIONS.

Where an order of reference contained a reservation of the right of review, the findings of the master are to be regarded, on exception, as presumptively correct, and should be sustained, except so far as against the weight of the evidence reported or so inconsistent with one another that they could not properly stand.

2. BANKS AND BANKING ⬅️253—DIRECTORS—LIABILITY.

Until some special necessity for action on their part is brought to their attention, directors of a national bank are entitled to rely on the cashier to guard against deficiencies in methods of bookkeeping which would enable subordinate employés to appropriate the bank's funds, and need not interfere independently.

3. BANKS AND BANKING ⬅️253—NATIONAL BANK DIRECTORS—AUTHORITY.

A by-law, adopted by the first board of directors of a national bank, requiring semiannual examinations by a committee of the board, may, in the absence of circumstances showing that it was inconsistent with good judgment and prudence, and without charging them with negligence, be waived by a later board; the by-law having been adopted before the amendment of 1874 (Act June 20, 1874, c. 343, 18 Stat. 123) to the National Banking Act (Act June 3, 1864, c. 106, 13 Stat. 99), which permits directors to allow incidental powers necessary to carry on the business to be exercised by officers or agents.

4. BANKS AND BANKING ⬅️253—INSOLVENCY—LIABILITY OF DIRECTORS.

Though the by-laws of a national bank provided for semiannual examinations by a committee to be appointed by the board of directors, whose duty it should be to examine into the affairs of the bank, count its cash, and compare its assets and liabilities with the balance on the general ledger, the failure of directors to regularly make such examinations, coupled with the fact that in those examinations made the cashier's ledger was accepted as showing the amount due depositors, cannot be deemed negligence, rendering the directors liable for the defalcations of a bookkeeper, where there was nothing to put the directors on inquiry, and the bookkeeper so skillfully concealed his peculations that he deceived the national bank examiners.

5. BANKS AND BANKING ⬅️253—DIRECTORS—LIABILITY—NEGLIGENCE.

The question whether the directors of a national bank were negligent in failing to discover defalcations by a bookkeeper must be determined in view of the circumstances surrounding the directors at the time of their alleged negligence, rather than by reference to the situation afterwards discovered and exposed by expert accountants.

6. BANKS AND BANKING ⬅️253—PRESIDENT—LIABILITY.

It is the duty of the president of a national bank, who practically manages the institution, to use reasonable diligence to know the character and habits of the bank's employés, and where he was warned that a bookkeeper, who in fact was stealing the bank's funds, was leading a fast life, and should be watched, his failure to make any inquiry, in view of the fact that there were other suspicious circumstances, which could hardly have escaped his notice, was negligence, rendering the president liable for the bookkeeper's subsequent peculations.

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. BANKS AND BANKING ☞253—NOTICE—WHAT CONSTITUTES.
Where the president of a national bank, who managed the institution, was warned that a bookkeeper was leading a fast life, and should be watched, he is, the notice and other circumstances being sufficient to attract attention and call for an inquiry, chargeable with knowledge of everything to which the inquiry might have led.

8. BANKS AND BANKING ☞253—PRESIDENT—LIABILITY.
Where the president of a bank, who was also one of the largest stockholders and a director, assumed management of the institution, and the other directors acquiesced, he is liable for a negligent failure to inquire into the habits and acts of an employé against whom he had been warned, even though the president received no compensation for such services.

9. BANKS AND BANKING ☞253—INSOLVENCY—LIABILITY OF DIRECTORS.
Where national bank directors, when they discovered an apparent shrinkage in deposits, were advised by the cashier that it was due to business conditions, they cannot, having had no reason to believe that a bookkeeper was despoiling the bank, be deemed negligent in failing to investigate the books, which would have shown that the apparent reduction in deposits was the result of the bookkeeper's manipulations and intended to cover his peculations.

10. BANKS AND BANKING ☞253—DIRECTORS—LIABILITY.
The failure of defendant, a director of a national bank, to act on a statement made to him by the president of another institution that it was reported an officer of defendant's bank was frequenting bucket shops and living pretty fast, cannot, where no name was mentioned, be deemed negligence on the part of defendant, rendering him liable for the peculations of a bookkeeper of his institution, which were being carried on at that time.
Brown, District Judge, dissenting in part.

On Motion to Amend Decree.

11. INTEREST ☞53—JUDGMENT OF APPELLATE COURT—RULE OF COURT.
Rule 30 for the Circuit Court of Appeals for the First Circuit (150 Fed. xxxv, 79 C. C. A. xxxv), declaring that, where a judgment of an inferior court is affirmed, interest shall be allowed from the date of the judgment below, and that the same rule shall be applied to decrees for the payment of money in cases in equity, unless otherwise ordered, applies only to decrees which are affirmed, and not to substantially modified decrees; therefore, where a decree in favor of a receiver of a national bank against the president, on account of the latter's negligence in failing to guard against the peculations of a bookkeeper, was substantially reduced on appeal, interest was properly denied, as the liability of the president was not established until rendition of such decree.

12. DAMAGES ☞67—INTEREST AS DAMAGES.
Where the right to interest is not established by contract, by statute, or by judgment, it ordinarily comes as an allowance in the nature of damages, based upon wrongful use or wrongful detention.

Appeals from the District Court of the United States for the District of Massachusetts; George H. Bingham, Judge.

Suit by John L. Bates, receiver of the National City Bank of Cambridge, Mass., against George W. Gale, Clarence Alfred Bunker and others, and Edwin Dresser, who died after suit was begun, but before final decree; the suit being revived against his administrator. From a decree for complainant (229. Fed. 772) for $283,218.20 against all of the defendants, the defendants appeal. Reversed and remanded,

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

with directions to dismiss the bill against all defendants except Edward Dresser's administrator, and remanded as to that defendant, with directions to reduce the decree to the sum of $264,088.02.

Robert M. Morse, of Boston, Mass. (Paul Dudley Dean and John B. Sullivan, Jr., both of Boston, Mass., on the brief), for appellants Dresser and others.

A. E. Pillsbury, of Boston, Mass. (Arthur P. French, of Boston, Mass., on the brief), for appellants Gale and others.

Clarence Alfred Bunker, of Boston, Mass., for appellants Bunker and others.

Frank N. Nay, of Boston, Mass. (William A. Kneeland, of Boston, Mass., on the brief), for appellee.

Before DODGE, Circuit Judge, and ALDRICH and BROWN, District Judges.

DODGE, Circuit Judge. These are appeals from the District Court, in a suit in equity by the receiver of the National City Bank of Cambridge, brought in 1910 under section 24, par. 16, of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1092 [Comp. St. 1916, § 991(16)]). Each of the five defendants named in the bill was a director of said bank during the whole or some part of the period between November, 1906, and February, 1910. The defendants Edwin Dresser, Sumner Dresser, and George W. Gale were directors, and Edwin Dresser was president, during the whole of said period, and for some years prior thereto. The defendants David A. Barber and George E. Richardson were directors from January, 1907, during the remainder of said period. By the defalcations during said period of one Coleman, employed in the bank in various capacities, the bank lost $310,143.02 in all. The defendants Edwin Dresser and George E. Richardson died after the suit was begun, but before the final decree. The defendant Gale has died pending these appeals. The District Court has held the said surviving defendants, and the estates of those deceased, liable for $283,218.20 of said total amount, that having been the amount of Coleman's defalcations after September 30, 1907, and lost to the bank, as the court found, through negligence on their part as directors, from which decree these appeals are taken.

The evidence in the case was heard by a special master. It consisted largely of oral testimony before him bearing upon the question of negligence. It came before the District Court, in connection with exceptions to his final report, upon a printed record containing, among other things, the report of the oral testimony so given. The master expressly found no negligence proved and none of the defendants liable for any part of said total defalcations.

The opinion of the District Court (229 Fed. 772) sets forth fully the principal facts involved, with the court's reasons for rejecting in part the conclusions reached by the master, and the different conclusions adopted by it. Although the plaintiff receiver recovers less than he claimed by the decree below, he has not appealed therefrom.

[1] 1. In dealing with the master's report, the court held that his findings were to be regarded as presumptively correct, and they were sustained, except so far as the court regarded them as clearly against the weight of the evidence reported, or so inconsistent with one another that they could not properly stand. This view as to the weight due to the master's findings the court based upon Kimberley v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764, and the terms of the order of reference to the master. Davis v. Schwartz, 155 U. S. 631, 15 Sup. Ct. 237, 39 L. Ed. 289, relied upon by the defendants as requiring that the master's findings of fact be regarded as unassailable, so far as depending "upon conflicting testimony or upon the credibility of witnesses, or so far as there is any testimony consistent with the finding," was distinguished on the ground that the order of reference therein dealt with contained no reservation of the right of review, as did the order of reference in this case. We find no error in the view adopted by the court.

[2] 2. The earliest in date of the failures in due performance of their duties, found by the court to have been proved against the directors, is a failure to have the bank's books properly examined on September 30, 1907.

When Coleman began his depredations in November, 1906, he was acting as bookkeeper, and also as paying and receiving teller. He had been bookkeeper since January, 1904, and had held both the above positions since October, 1905. He continued to hold them both until November, 1907. In that month a separate teller was employed, and Coleman was thereafter bookkeeper only. From January, 1904, the individual or depositors' ledger, important in this case, was in his sole charge. While bookkeeper only he did not, but while teller also he did, have the handling of the money coming into the bank day by day.

The methods whereby he accomplished and concealed his thefts are set forth in the opinion below, and need not be here restated in detail. They were ingenious, and appear to have been altogether novel. Earl, the cashier, had habitually let him keep the depositors' ledger, without verifying his work thereon at any time, and had also let him deal unsupervised with checks on the bank presented day by day in envelopes received at the bank from the clearing house or from certain banks not acting through that institution. Earl had habitually accepted as correct the total amounts called for from the bank in settlement by the slips received with each envelope and presented to him by Coleman as correct, without himself verifying the slips by the checks in the envelope before Coleman could remove therefrom and suppress his own fraudulently drawn checks. Earl had kept the cashier's ledger according to said slips, and had made the remittances called for by them as if correct in amount, with no attempt at any time to see for himself whether they were in fact correct or not. To the routine thus established Coleman had adapted his methods of depredation and concealment, and to its deficiencies their success was due. There is little or no controversy as to the material facts regarding these matters.

The master and the District Court agree in finding none of the defendants liable for losses to the bank by Coleman's thefts before September 30, 1907. The amount he had taken before that date appears to have been about $27,000 in all. The sums making up this amount having been taken while he was teller, as well as bookkeeper, it is far more probable, as the court finds, that he took them, as a rule, out of the cash coming into the bank, than by resort to his other method; i. e., that of procuring the drawing of a check to his own order, to be included in the clearing house or other envelope received at the bank, abstracted by him before it could come under the cashier's eye, and wrongfully charged up by him on the depositors' ledger, as more fully explained in the court's opinion. What he took in cash he concealed, for the most part, by falsely charging the amount taken to the account of some depositor on said ledger, so as to leave the apparent total due all depositors, according to that book, in agreement with the total appearing from the cashier's ledger, which total, however, was always less than the true amount by the amount of his stealings.

That it was not due to any negligence chargeable to the defendant directors that Coleman was enabled to put his method of stealing into operation, and to keep it from being detected up to the end of September, 1907, may now be taken as established. If the bank's losses thereby, prior to that time, can be attributed to negligence on the part of any official connected with the bank, Earl, its cashier throughout said period, is the only official so negligent. As to Earl, the court said in its opinion:

"Possessed of his knowledge and intelligence, it would seem that, if he had exercised the slightest care in supervising Coleman in the handling of the clearing-house checks and in the keeping of the depositors' ledger, the greater portion of the defalcation never would have taken place."

But the court, here agreeing with the master, expressly declined to find the bank's directors negligent in employing Earl originally, as they had done in 1903, and it nowhere overruled or disturbed findings by the master that they had not been negligent in retaining him in office. The court regarded the question whether or not they were so negligent as of little importance, in view of the findings made by it.

As to Edwin Dresser, the bank's president and executive head, he appears without dispute to have taken, throughout the period in question and for many years before, a part in its daily operations not taken by any other director, which brought him much more closely than any of them into connection with said operations, and afforded him constant opportunities, not possessed by them, for observing the methods followed in conducting said operations and the manner in which the various employés were performing their duties.

It is undisputed that he had regularly been at the bank every morning for an hour or two, to consider with the cashier questions relating to investment of the bank's funds, and again for an hour or so every afternoon, to ascertain what had gone on during the day; that he had been accustomed to deal personally with matters such as shortages of tellers' cash, or their discharge when found by him incompetent

250 F.—34

or careless, and to sign at times checks for balances due the clearing house or the First National Bank of Boston, instead of the cashier.

It is also undisputed that he was one of the largest stockholders of the bank, and one of the largest depositors therein; that his personal deposit account ran from $35,000 to $50,000 all the time, and was an inactive one; also that he was president and principal owner of a company which was also a large depositor. In filling vacancies on the board of directors his influence appears to have been controlling.

To the extent above stated, he had, with the acquiescence of the other directors, exercised immediate supervision over matters connected with the administration of the bank, to which they had given consideration only when brought before them at their regular weekly meetings.

The negligence of the defendant directors, because of which the court has found them liable, is therefore not any failure in duty on their part before September 30, 1907. It consists wholly in their failure, on or after that date, to discover that Coleman was practicing his method of stealing the bank's funds, and was so manipulating the entries on its depositors' ledger from time to time, as to prevent their showing what he had done or was doing, except by resort to a more thorough and searching examination and checking of said entries than any which had ordinarily been made by the directors. By said method, as is undisputed, he successfully concealed his thefts, not only from the cashier, but also from the national bank examiners at their semiannual examinations of the bank and its books. Two such examinations were made during the above period before September 30, 1907, viz. in December, 1906, and June, 1907, and five after that date, viz. in December, 1907, June and December, 1908, and June and December, 1909. These examinations were made alternately by two different examiners.

The appellants contend that the evidence did not warrant the court in treating the master's finding that the charge of negligence on their part was not sustained by the evidence, as either clearly against the weight of evidence, or as so inconsistent with his other findings that it could not properly stand.

If negligence, as above appears, is not chargeable to the directors in respect of any of Coleman's stealings before September 30, 1907, it follows that they cannot be held responsible merely because of the deficiencies permitted by Earl to exist in the methods or routine followed in conducting the bank's regular operations or in recording them on its books, notwithstanding that it was by taking advantage of such deficiencies that Coleman was enabled to accomplish and conceal his stealings. They were entitled to rely, as they did, upon Earl to guard against any such deficiencies, and until some special necessity for such action was brought to their attention they were under no duty to inquire or interfere independently of him. Briggs v. Spaulding, 141 U. S. 132, 165, 166, 11 Sup. Ct. 924, 35 L. Ed. 662; Warner v. Penoyer, 91 Fed. 587, 590, 591, 33 C. C. A. 222, 44 L. R. A. 761.

[3-5] The negligence of which the court has found the directors guilty on September 30, 1907, does not consist in the neglect of any

special necessity for investigation then brought to their attention, but in failure to make such examination of the bank's books as in the opinion of the court their regular duties required them to make.

The court found that, if they had then made such an examination as article 19 of the bank's by-laws required, they would have compared the bank's liabilities, as shown on the depositors' ledger, with the cashier's ledger (on which alone they had been accustomed to rely), in order to ascertain whether the bank's books were being correctly kept; that such comparison required them to add the balance footings or the balance columns as then found on the depositor's ledger, whose totals either did not appear therefrom at all, or appeared incorrectly; that if the true total of the balance footings had then been so ascertained, the fact that it was $20,000 larger than the sum due depositors on the cashier's ledger would have been disclosed, and if the true total of the balance columns had been so ascertained, the fact that it was $27,000 larger than the amount shown due depositors on the cashier's ledger would likewise have been disclosed; that if they had added only the balance footings, and compared the total with the cashier's ledger, they would have ascertained Coleman's irregularities; and that, not having done so, they were chargeable with negligence and liable for his defalcations after that date.

Discovery of the fact that the bank really owed its depositors $27,000, or even $20,000, more than its cashier's ledger showed on the date referred to, would no doubt have led to an ascertainment by the directors of Coleman's irregularities, as the court found. After such a discovery the directors could not, without unquestionable negligence, have omitted an immediate and thorough audit of the bank's books and accounts, going to the extent necessary for a full and complete explanation of the discrepancies found and the causes thereof.

The only ground for holding such examination necessary on the particular date of September 30, 1907, is that the directors then declared the regular dividend, payable October 1, 1907. Dividends were regularly declared as of April 1 and October 1, and there were four later dividend declarations: On March 23 and September 28, 1908, and March 30 and September 27, 1909. For the examinations required as above by article 19 no dates were expressly fixed by the by-laws or otherwise, but the court found that they "were intended to take place before the dividends were declared." Of the two examinations appearing from the records, however, only the second (March 30, 1909) was made on or just before the date of the dividend declaration; the first (November 16, 1908) came six weeks after the October, 1908, dividend.

Article 19 of the bank's by-laws, quoted in the opinion below, provided that a committee should be appointed by the directors every six months—

"to examine into the affairs of the bank, to count its cash, and compare its assets and liabilities with the balances on the general ledger, for the purpose of ascertaining whether or not the books are correctly kept and the condition of the bank in a sound and solvent condition, the result of which examination shall be reported to the board at their next regular meeting."

Article 16 required the keeping of a minute book, in which the proceedings of the board at all regular and special sessions were to be recorded.

The directors' records show only two examinations by them during the period here in question. In neither instance do they expressly show the appointment of a committee to examine. They show only that, on November 16, 1908, the directors examined the bank and found the cash balance correct. This record is attested by Edwin Dresser, Gale, and Barber as directors. They also show that on March 30, 1909, a special meeting of the directors was held for the purpose of examining the bank, the president presiding; members present, Gale, S. Dresser, and Barber.

Although the records show no other examinations, the master found from the evidence that others were in fact made by the directors as a board. When, or by whom, said other examinations were made, the master did not find; there being no evidence before him sufficient for the purpose.

As to such examinations as were made, whether by committees or by the board itself, the master's finding is undisputed that they were never carried to the extent of examining the individual (i. e., depositors') ledger, and comparing it with the general (i. e., cashier's) ledger.

The court found that no examinations, except the two shown by the records as above, were made in 1907, 1908, or 1909. Whether or not this was a finding clearly required by the weight of the evidence, we need not consider. No directors' examination, whenever or however made, having before extended to such verification of the figures found on the depositors' ledger as, in the view of the court, was necessary to an adequate performance of the directors' duties, it results that the real inquiry is whether their failure to make the kind of examinations and comparisons deemed necessary by the court on September 30, 1907, was a failure in duty on their part so clearly negligent as to warrant the court in rejecting the master's findings, and to render the directors all responsible for the subsequent losses by Coleman's stealings. If not so liable as of that date, it is plain that they are not so liable for the subsequent failures to make like examinations before each dividend subsequently declared.

To hold all the directors chargeable with negligence rendering them all so responsible, merely because they failed to make the additions and comparisons held necessary by the court, requires, in our opinion, the application of a standard of diligence more exacting than any heretofore applied in the case of national bank directors; nor can we regard the application of such a rule as justified by the circumstances here shown.

We do not think it can be said that there would necessarily have been a negligent breach of duty on the part of every director, had examinations in accordance with article 19 of the by-laws been wholly omitted during the period here involved; no special reason tending to forbid such omission being shown.

The by-laws were adopted by the then directors when the bank was organized in 1865. They were not adopted by the corporation, nor were their requirements imposed upon the directors by any authority higher than that of the board itself for the time being. They were adopted before the amendment of 1874 (Act June 20, 1874, c. 343, 18 Stat. 123) to the National Banking Act (Act June 3, 1864, c. 106, 13 Stat. 99), which permitted the directors to allow incidental powers necessary to carry on the bank's business, to be exercised by officers or agents, as was also the case in Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662. We see no reason to doubt that the requirements of article 19 might have been waived or their observance omitted by the directors, if regarded by them as no longer necessary, in the absence of special circumstances showing such waiver or omission to have been inconsistent with good judgment and reasonable prudence. Nonobservance of a similar by-law for fourteen years appeared in the above case of Briggs v. Spaulding; the matters covered by it having been left by the directors wholly to the president and cashier, and without any formal amendment or repeal of the by-law. The directors were nevertheless exonerated, although stringent observance of the by-law could hardly have failed to disclose the misdoings of the president and cashier for which it was sought to hold them responsible. It was considered sufficient by the court that the manner of conducting the bank's business, in that and other respects, had been sanctioned by long-continued usage.

In the present case the court treated article 19 of the by-laws as evidence in the nature of an admission by the directors as to what they considered themselves called upon to do in the performance of their duties. They had, indeed, left the by-law unrepealed, and the testimony of one of them (Sumner Dresser) was that the usual times for making examinations of some sort had been March and September. But no committee to examine had ever been appointed as called for by the by-law, such examinations as were made were by all the directors who happened to be present, and no such verification of balances on the general ledger by verification of the figures on the depositors' ledger had ever been contemplated or recognized as a required feature of the examinations to be made. The by-law does not expressly require that method of verification; it leaves the choice of methods to the examiners. Taking it and the directors' practice under it together, we cannot regard them as clear and unmistakable evidence that the directors had considered themselves called upon to follow the process thought necessary by the court in making their examinations.

Nor can we find negligence on the directors' part clearly and unmistakably shown merely by the fact that they omitted to make the examination in the particular way which the District Court regarded as a necessary test required by ordinary considerations of precaution. It is difficult to see upon what principle a director can be held negligent merely for omission to perform an act not usual, and not known by him to be necessary or important, especially in the absence of anything suggesting inquiry as to its necessity or importance. What

was regularly done at the examinations made appears from the quotation in the opinion below from the master's report; and it proved insufficient for the purpose of bringing to light that which would have led to discovery of Coleman's practices, in that, as the opinion below states:

"They took the amount due depositors upon the cashier's ledger as correct, which was, in fact, inaccurate by the amount of Coleman's stealing."

Speaking generally of the directors, there had been nothing to put them on inquiry or cause them to suspect that the amount shown by the cashier's ledger as due depositors might be inaccurate, and might therefore require verification by such additions of figures on the depositors' ledger, and we cannot hold their reliance upon the cashier and his ledger for a correct showing of said amount to have been clear and unmistakable negligence. The amount so taken by them as correct, as the master found, "would be and apparently was verified by [the cashier's] showing of expenses paid, investments made, cash on hand and deposited with other banks."

As, in view of Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662, above cited, we could not hold mere nonobservance of the by-law to be a proved failure in performance of a duty required of the defendants as directors so we cannot hold the above failure on their part to go behind the figures given them by the cashier on his ledger of itself to be a proved negligent failure in due performance of their duties. Such action on their part would have been a "measure of unusual precaution, not imperative when there was no reason to distrust the integrity or efficiency of the cashier"; and directors, as has been held, are "not to be deemed remiss because they did not resort to exceptional methods, or because they relied on the cashier's supervision over the books and accounts, or because they reposed confidence in his reports of the amount and other clerical details of the assets and liabilities." Warner v. Penoyer, 91 Fed. 587, 591, 33 C. C. A. 222, 44 L. R. A. 761.

Neither the master nor the court below have found, nor does anything in the record indicate, that on or before September 30, 1907, there had come to the notice of the president or of any other director anything tending to arouse in their minds any suspicion or distrust of the cashier's efficiency, or of the reliability of the books and accounts kept under his supervision.

In view of the subtlety of the wrongdoer's system for covering and concealing his speculations and embezzlements, we are also unable to accept as clearly warranted by the evidence the conclusion reached by the District Court that due diligence on the directors' part in comparing the bank's assets and liabilities with the cashier's ledger would have resulted in discovery by them of the discrepancies found by the court to have existed on that date between it and the cashier's ledger.

Coleman's manipulations of the depositors' ledger succeeded in concealing his methods from the national bank examiners, as stated below. But the court had before it the results of six months' scrutiny of both ledgers by an expert accountant, who had also examined in

connection with them everything found in the bank's books and papers which could assist him in tracing Coleman's dealings with the depositors' ledger in his constant efforts to prevent the entries thereon from showing the shortages caused by his thefts. By the aid of these results the importance of determining the true amount of the columns and footings in the depositors' ledger referred to by the court, and how to select and follow the significant columns and footings in order to accomplish such determination had then been made clear. But we are not satisfied, under the peculiar circumstances of the concealment, that it is reasonable to find, or to assume as clearly and unmistakably established, that the directors, acting as they would have had to act on September 30, 1907, without the aid of any of the knowledge obtained after the event, and not prompted to exceptional methods of investigation by any reason to believe them necessary, would have discovered for themselves the important thing to be done and accomplished it with success. We agree with the master that the depositors' ledger "is a difficult book to follow and one in which a person not thoroughly familiar with it and used to handling it would not be likely to readily detect error."

If it can be said that Edwin Dresser, the president, though neither an accountant or bookkeeper, nor familiar with banking methods of keeping either individual or general accounts, had, or should have had, sufficient familiarity with this particular book because of his long-continued daily opportunities for becoming familiar with the method of bookkeeping followed in his bank, we find no sufficient ground for supposing sufficient familiarity or bookkeeping knowledge to that end on the part of any of the other four directors. Richardson, it is true, had been for years paying teller in a Boston trust company, a fact which we can hardly regard as sufficient for the purpose in his case, there being nothing to show that he had ever had to deal with such a book as this. The occupations of the remaining directors still less appear to have been such as would have been likely to qualify them in any respect for such an inquiry.

A further consideration seems to us important in this connection. Coleman not infrequently resorted to methods for concealing the fact that the entries on the depositors' ledger did not really correspond with the cashier's ledger, as they were supposed to do, other than that method which might have been detected by addition of his balance footings or balance columns. He adapted his methods of concealment to the varying danger of detection as it appeared from time to time. In particular, he had on many days so raised or lowered the amounts shown as balances due individual depositors as to leave a correct addition of the footings or columns in agreement with the cashier's ledger and to require ascertainment of the true balances due depositors in order to detect the shortage. To this method he appears to have resorted when any examination by others of his depositors' ledger seemed likely to be impending. By resort to it he succeeded in preventing discovery by the national bank examiners at any of their examinations—in one instance (December, 1909) while their examination was proceeding and detection had appeared in-

evitable. It cannot, therefore, be assumed as certain that the entries now found on the depositors' ledger as of September 30, 1907, would have been found there as they now stand, had the method of examination suggested by the court been undertaken by the directors on that date. Nothing then known to the directors tended to suggest to them the importance of making their examination without Coleman's knowledge.

If any examination of the bank by the national examiners has since been made to appear in any respect inadequate, in the light of the discoveries made as above by the expert accountant, each of them appears to have been at any rate much more thoroughgoing than any of the directors could have been expected to make without expert assistance. That such examinations were regularly made twice in each year, and without discovering anything wrong in the bank's condition or bookkeeping, the directors knew, and that fact affords still another reason for believing that they were going along under a feeling of security, and with no cause to suspect wrongdoing or irregularities; a reason which tends to forbid the conclusion that the directors are shown to have clearly and unmistakably failed in the ordinary care due from them, merely by their omission as above to make more regular and more searching examinations themselves.

Nothing in the evidence tends to show that examinations of the kind held necessary by the court are or have ever been usually recognized or understood as part of the regular duties which directors of such a bank as this are expected to perform, nor is any such duty required by any rule of law. Judging these directors, as they are entitled to be judged in the light of all the circumstances present to their minds at the time, as business men of average business abilities and accomplishments, with no pretensions to instinctive foresight, or expert training in respect to bank bookkeeping, we are unable to believe that their omission to make such examinations on September 30, 1907, or thereafter, in the absence of notice of special necessity therefor, clearly proves negligence on their part. To this extent we think the master's findings should have been confirmed. Under a familiar principle, in determining the question whether the evidence was so clear as to justify rejecting the master's findings against negligence, reference must be had to the situation which surrounded the directors at the time of the alleged omissions of duty and before the wrongs of Coleman had been discovered and exposed, rather than by reference to a situation afterwards discovered and exposed by experts. 1 Thompson on Law of Negligence, § 28. The character of after-discovered conditions might be such, in a given case, as to tend to show negligence, yet fall far short of making it clear and unmistakable; and, again, they might be such as to have very little, if any tendency to show negligence.

[6, 7] 3. Thinking, as we do, that there was no want of due care in the discharge of the directors' duties clearly established by their failures to make the above examinations of the depositors' ledger thought necessary by the court, the matter next in order of time to be considered is the court's finding that there was such a failure in

due care on Edwin Dresser's part, in neglecting to bring before the other directors Fillmore's letter to him dated September 29, 1908, or Fillmore's statements and warning to him regarding Coleman in a conversation near the end of October, 1908, and in failing to take any action whatever in consequence thereof toward investigating Coleman's life outside the bank, or his doings within it, as to render him individually liable. The substance of Fillmore's letter and of what he later said to Dresser appears in the District Court's opinion.

Fillmore was a resident of Cambridge, and a responsible person so far as appears. As a depositor in the bank he had an interest with whose protection Dresser was charged, so far as reasonable diligence in performing the duties of president and a director could secure it. Whether or not Fillmore's claim had any justification that his package of money left in the bank's safe had been taken by some one in the bank, his statement that he believed Coleman was "living a pretty fast pace," his statement that he "had good authority for believing that Coleman was supporting a woman," and his advice to Dresser, "Look after Coleman," seem to us, as they did to the District Court, notice to Dresser calling for immediate action on his part, such as he could disregard only at his peril.

At the time of these warnings Coleman had in fact been speculating for nearly a year through Boston brokers, having begun such speculations about the time he began taking the bank's money in November, 1906; and he thereafter, in fact, continued them until February, 1910, in which month his stealings were discovered.

He had also, during the same period in fact, been spending money freely in Boston hotels and restaurants, and generally leading a fast life, as the court's opinion states.

He does not appear to have taken any pains to conceal either his speculations or his other doings in Boston outside bank hours. They had been going on long enough to prevent any reasonable doubt that prompt and appropriate inquiry in the proper quarters would have shown that Fillmore's statements and warning had ample foundation in fact. Had the other directors been informed of them, the duty of the board would have been to inquire at once as to their truth, and, having learned that there was a substantial basis for them, their duty to end Coleman's connection with the bank and institute an immediate and searching scrutiny of all his doings therein would have been plain.

It cannot be said that there was nothing regarding Coleman within Dresser's knowledge at the time which should have led a bank president in his position to suspect that there might be truth enough to need investigation in what Fillmore had said, or should have led him to apprehend danger in wholly disregarding and neglecting it.

The bank never paid Coleman more than $12 a week; yet since 1907 he had been running an automobile which cost $800, even coming to his work in it and leaving it standing in front of the bank. We cannot doubt that Dresser knew the fact that Coleman was using the machine as its owner, because this was a fact generally known to the

other persons daily present at the bank. If there is evidence that Coleman paid for the machine out of commissions on sales of other machines negotiated by him, it does not appear that Dresser knew, or ever asked, how he had paid for it. Here was a piece of apparent extravagance on the part of a $12 a week clerk, trusted to perform important duties in the bank, and not long before intrusted with the bank's money, which we think should have suggested at once to the bank's president, taking the part which Dresser is shown to have taken in the daily administration of the bank's affairs, and relied upon as he was by the other directors, particularly in matters concerning the hire and discharge of employés, the need for active investigation. It should have aroused his suspicion, as it did later the suspicions of persons unconnected with the bank's management, one of whom remarked upon it to Dresser himself in February, 1909, and another to Earl in August, 1909—remarks which Earl reported to Dresser. Dresser, however, took no action in consequence of these remarks, any more than when Coleman first appeared as owner of an automobile, or when he received Fillmore's statements and warnings.

There was evidence that before the fall of 1908, and in fact ever since 1904, it had been Coleman's frequent practice to give orders to brokers for the purchase or sale of stocks, over a telephone in the bank within a few feet of the cashier's desk, and in the next room to that occupied by Dresser when present at the bank. There was also evidence that Coleman had talked on more than one occasion with Dresser about stocks. That he once spoke about a purchase or sale of copper stocks intended by him Dresser admitted, in testimony given before the master. The date of this last occurrence did not appear; but if Dresser is to be credited with entire ignorance in the fall of 1908, that Coleman was interested in the stock market, he must be supposed to have paid no attention whatever to what went on in his immediate presence.

If what had been brought to Dresser's notice about Coleman's automobile, and his dealings in stocks, would not of itself have been enough to call upon him for active inquiry and investigation, we think it clear that after Fillmore's statements, tending to confirm an apprehension of danger to the bank which facts already within his notice tended to suggest, he could no longer remain inactive, and still be entitled to say that he was doing his full duty.

Under a familiar rule, in view of Dresser's relations to the bank and the other directors, it was his plain duty, not only to know the character and habits of the bank's employés and exercise reasonable supervision over them, but to use reasonable diligence in respect to all matters bearing upon the question whether they should be retained in positions of trust.

Notice sufficient to attract attention, and put a party on his guard and call for inquiry is notice of everything to which such inquiry might have led. Wood v. Carpenter, 101 U. S. 135, 141, 25 L. Ed. 807; Shauer v. Alterton, 151 U. S. 607, 622, 14 Sup. Ct. 442, 38 L. Ed. 286.

So far as appears, Dresser had neither known nor tried to know anything about Coleman's course of life when away from the bank. According to his testimony, he knew Coleman's father, a respectable man, and Coleman had been "highly recommended" when first employed in the bank in 1903. Besides this, Coleman's behavior while actually in the bank appears to have been all the material he ever had upon which to form a judgment as to his trustworthiness. The recommendation in 1903 appears to have come only from the commercial school in which Coleman had just taken a course. He was then only 17 years old, and he was then taken into the bank only as messenger at $4 a week. There was clearly nothing in all this to excuse blind confidence on Dresser's part in his fidelity, five years later, when being trusted in positions affording greatly enlarged opportunities for stealing, or complete disregard of charges seriously made, and in substantial respects supported by facts within Dresser's own knowledge at the time, that Coleman was following a course of life so likely to put him under temptations to dishonesty.

The correctness of Coleman's entries on the depositors' ledger might have been tested by Dresser more readily than by any of the other directors. Means for detecting errors in them were more constantly and more readily available to him than to them, because of his daily presence in the bank as its executive head, and the fact that his own personal deposit account and that of the company controlled and managed by him were two of the largest on the bank's books. They were the two more frequently manipulated by Coleman than any others on the depositors' ledger, when it suited his scheme of concealment to charge the sum taken by him to an individual account as if drawn by the depositor, or to drop an individual depositor's apparent balance without entering any charge to justify the drop.

Although Dresser kept no check book showing by its stubs what checks had been drawn, he had data enabling him to tell at any time how much ought to be standing to his credit on the bank's books, and the occasions were numerous and common upon which any examination of either account as shown on Coleman's ledger must have shown him gross error in the balance there appearing. Examination enough for this purpose he might have made at any time in a few minutes, on his own statement. He never attempted anything of the kind, but remained content with the monthly showing of his passbooks, which Coleman took care to have always correct. In Dresser's testimony he admitted that he knew the way the depositors' ledger was kept, and had occasionally looked it over; but he never had done so to see whether it was correctly kept.

Examinations of Coleman's figures as above by Dresser in October and November, 1908, would have compelled further investigation, and such investigation, properly conducted, would have shown Dresser that what he had been told about Coleman's speculative habits and fast life was true. If, with this knowledge, he had let Coleman continue in the bank as before, without full inquiry into all his previous dealings with its funds or books, Dresser would have failed in his duty toward the depositors, and would thereby have become liable for sub-

sequent losses of its money through Coleman's continued dishonesty. Preston v. Prather, 137. U. S. 610, 11 Sup. Ct. 162, 34 L. Ed. 788.

Moreover, and by way of illustration, it appeared from Coleman's testimony in the trial of this cause before the master that during this period he was engaged in faro bank gambling in New York, and we think it quite within the realm of probabilities that, if reasonable circumspection had been exercised and reasonable inquiries and investigations made as to his habits and doings, his frequent journeys to New York on the afternoon trains, returning in the morning, and the stupendous losses at faro would have been uncovered and the bank's money saved. It is true that the frequency of these journeys and the extent of the losses were not disclosed until the trial of Keliher (193 Fed. 8, 12, 16–18, 114 C. C. A. 128), who was associated with Coleman in these swindlings and gamblings; but, it appearing in this litigation that these doings were at a period closely connected with the time of the disclosures to Edwin Dresser as to Coleman's habits, we think it is something which we may consider on the question as to what reasonable circumspection and investigation on Mr. Dresser's part would probably have discovered at a time to save the bank.

In view of Dresser's position as president, of all his previous knowledge regarding Coleman, and of all that due use of means constantly at his command would have afforded him, we are unable to find reasonable excuse for his total disregard of what Fillmore had said to him. We cannot avoid the conclusion that reasonable diligence in discharging the duties of his office required him to report what Fillmore had said to the directors, and to see that steps were taken without delay to find out how far those statements were founded on fact. For his failure to take any action of the kind no excuse is shown.

[8] It is true that Dresser was receiving no compensation for what he did, either as president or as director. It is true, also, that the duties he alone had been accustomed to discharge in connection with the bank's management had never been expressly delegated to him. He had, however, assumed their performance, and continued to perform them for many years, and the other directors, by acquiescence, had been relying on him for their proper performance. We think it unmistakably clear that failure by him to use reasonable care in performing them, after a warning about which the other directors knew nothing, imposes upon him a responsibility not incurred by them, and not imputable to them in such a sense as to make them liable for the resulting consequences.

Because of his failure to take any steps himself regarding what Fillmore had told him, and because of his failure to inform the directors, thus affording them an opportunity of then putting a stop to Coleman's frauds, we are of opinion that the responsibility for losses due to their further continuance must rest upon him. If, as we think, the opportunity of then arresting the course of Coleman's depredations was lost by Dresser's neglect, what the bank lost by their continuance was lost through his neglect. We therefore find no error in the District Court's conclusion to this effect.

[9] 4. Next to be considered is the District Court's finding that not only Edwin Dresser, but all five directors, are liable for the total amount taken by Coleman after the end of September, 1909. Up to that time he had taken $130,193 in all; afterwards he took $179,950 more.

It appears without dispute that a decline in the total amounts due depositors, as shown by the cashier's ledger and his statements presented each week to the directors, began to show itself in September, 1909, that it later became more rapid and more serious in amount than at first, and that this continued until the failure. It was noticed by the cashier and the directors, and led them to discuss its probable cause, to go over the cashier's ledger in search of possible errors, and to count the cash and securities. The only result of the consideration they gave to the matter was a conclusion, accepted by them all, that the decline must be due to general business conditions, and to competition of newer institutions offering greater attractions to depositors. With this they remained content, taking no steps to find other explanations for the shrinkage, either by having an audit of the bank, or an examination of the depositors' ledger, or a scrutiny of the checks and clearing house slips, kept in the bank each month until the passbooks were balanced at the end thereof.

The court held that reasonable care on the directors' part required them, in September, 1909, when they knew the shrinkage in deposits to be abnormal, to cause an audit to be made, or at least an examination of the checks then in the bank, in addition to such examination of the depositors' ledger as it had held necessary to be made by them twice a year, as above, beginning with September, 1907, and therefore also in September, 1909. Resort to these measures, as the court found, would have revealed Coleman's defalcations; a reasonable time for such examination and discovery had expired at the end of September, 1909; and the directors' liability for all the subsequent losses was therefore held established.

There had in fact been no real falling off, either in the number of depositors or in the average daily amounts then being deposited. This was apparent from the cashier's ledger, which correctly set forth the amount of each day's deposits. The total amount which ought to have been in the bank to the credit of the depositors was over $400,000. The previous normal average of total deposits had been about $300,000, rising above or falling below that figure by about $25,-000. Coleman's takings, at first comparatively small in amount, had not for some time offset the actual increase in deposits; and his methods of concealing them had meanwhile prevented their effect in reducing the totals due depositors from becoming noticeable in the showings of the cashier's ledger. But, having by the fall of 1909 come to offset said increase, and becoming thereafter larger in amount and more frequent, the reduction they were effecting necessarily began to be disclosed by said ledger, and it rapidly became more and more apparent therefrom.

We do not think the directors can fairly be charged with knowledge that the shrinkage in deposits was "abnormal" at so early a date as that adopted by the court in the above findings.

In the opinion, the highest and lowest totals of deposits for 1907 and 1908 and for each month of 1909 are set forth. These figures do not show any shrinkage which the directors must have regarded as abnormal before the last 10 days of October, 1909, at the earliest. They support the testimony of Sumner Dresser that the normal average for several years had been taken to be about $300,000—sometimes $325,000 for a high, and $275,000 for a low, normal. The lowest total in 1909 before September 1 had appeared on June 29, and was a little over $271,000. But during the following three months it had reached $345,000 in August, and been over $300,000 for a considerable part of the time. Not until September 29 did it fall again, as it had in June, to about $271,000. After September 29, while $300,000 was never again reached, totals of $280,000 or over were shown for much of the time. The lowest in October was $255,878 on the 23d, from which time the decline appears to have been rapid and steady, less than $200,-000 being shown on December 18, and only about $107,000 when the bank closed its doors.

The master found the time when a decline was noticed and considered by the directors to have been "in September or the early fall of 1909." Sumner Dresser's testimony that it was "about the last of October" was not contradicted, and, in view of the figures, seems to fix a time more in accordance with probability. The date fixed by the court as that whereon a reasonable time for taking the measures held necessary in view of the shrinkage expired seems to us in any event at least a month earlier than the evidence warrants.

From our conclusion that Edwin Dresser's negligence in disregarding Fillmore's statements about Coleman had made him responsible for the failure to discover and stop the stealings ever since the end of November, 1908, it follows that he, at least, is also responsible for the failure to discover and stop them, when the above apparent abnormal shrinkage in deposits was under consideration by the directors. To him alone had come notice of facts which ought to have led him to suspect the need of complete investigation as to Coleman's doings in the bank; and it had ever since been in his power to use those methods of inquiry which, as above stated, were more readily and constantly available to him than to any other director. Here was additional reason, brought to his notice in September, 1909, for suspicion that something wrong might be going on within the bank, and a reason which should have had especial force with him, because of the notice received by him months before, but never imparted to his fellow directors.

As to the other four directors, to whom no such notice had come, in 1908 or subsequently, as had come to the president, the question is whether or not the evidence clearly shows their omission to take, in the fall of 1909, the measures held then necessary by the District Court, because of the apparent drop in deposits, to have been a failure in reasonable care on their part.

We agree with the District Court that, if such measures had then been taken, they would have revealed Coleman's defalcations. Not only is it true that verification of the totals on the depositors' ledger

would have revealed much larger and more frequent discrepancies upon comparison with the cashier's ledger than at the end of September, 1907, but it is also true that from the checks in the bank during September, October and November, 1909, and particularly from those of the last two of said months, there would have been found missing so many checks and for so large amounts, as must have shown the immediate road toward complete discovery. The missing checks represented Coleman's stealings during the month, they had been included in the bank's payments in settlement with the clearing house or with other banks, and they ought to have been in the bank's custody. Neither on the days upon which they had been paid, nor on any subsequent day, had they been charged upon the depositors' ledger; but to discover that this was true would have been much more difficult than to discover that they were missing.

We further agree with the District Court that the drop in deposits, as apparent from the cashier's ledger, called for investigation as to withdrawals from the money on deposit, rather than as to any supposed falling off in number of depositors or in amounts deposited. While the apparent shrinkage did not necessarily indicate that the bank's funds were being stolen, it did indicate that money was being withdrawn at a rate faster than that at which it was being intrusted to the bank's care, and that this was happening to an unprecedented extent.

But the evidence by no means shows that inquiry as to withdrawals of deposits was wholly neglected, or that the directors' adoption of a mistaken explanation as accounting for the shrinkage was altogether without excuse. They were told by the cashier that the depositors were drawing out their money. He specified several large accounts from which considerable withdrawals had recently been made. They were also told by the teller that, while no account was being lost, the accounts were being largely reduced by the depositors themselves. That all this did not go far enough to account for all the shrinkage is true, yet we do not see how the directors, other than Edwin Dresser, could reasonably have been expected to find out of themselves that it was true, and, in view of the rule that the conclusion of negligence must be clearly and unmistakably established in order to reject the findings of the master, we cannot find warrant for sustaining the finding of the District Court that they were so far culpable as to make them chargeable with individual liability upon the ground of negligence in failing to do more than they did.

The measures which would have led to discovery of the truth about the shrinkage, had they been taken at the time, appear simple and obvious, now that all the facts then existing have been brought to light. It is true, also, that such discovery, when made in the following February, was effected by means of those measures, and at a cost of comparatively little time or labor.

It was so effected, however, not by persons without special skill or knowledge, but by the president and treasurer of a different bank, examining the accounts of this bank with a view to its purchase. Both were possessed of a knowledge of banking methods of accounting, and

an experience in dealing with accounts of that character, such as these directors neither had nor were expected to have, so far as appears. In view of all that can be supposed to have been present to their minds at the time, it seems to us more than can reasonably be expected of them that they should either make the same discovery for themselves, or give the cashier such directions as would have enabled him to make it; at least, under the circumstances, we think the omission to do more falls far short of affording the measure of proof required to justify clearly and unmistakably, and contrary to the findings of a master, a conclusion of negligence and individual liability on the part of directors for the wrongdoing of clerks or subordinate officers of banks to whom duties have been entrusted.

No complete audit of the bank had been made since the summer of 1903, just before Earl assumed his duties as its cashier. The only effectual step which these directors could have taken toward finding the true reasons for the shrinkage noticed in the fall of 1909 would have been to order another complete audit made by competent experts.

We cannot regard it as clearly shown, however, that their failure to take this course was a negligent failure in the reasonable care required of them. No such action was recommended, or even suggested, by the cashier or by the president; nor is any sufficient ground found for the conclusion that the directors ought then to have known that they could no longer safely rely upon the cashier, or his methods, or his representations regarding the bank's condition, but were called upon to take action independently of him. Except the drop in deposit totals, which he accounted for as above, nothing appears to have been brought to their notice in the fall of 1909, any more than in September, 1907, tending to suggest a necessity for such action on their part.

It is true that the auditor's report of 1903 had called attention to the danger of letting the depositors' ledger "go a day with errors not found." Not only the president, but Sumner Dresser and Gale also, must be supposed to have known this fact when the report was made. The other two defendants were not directors at that time. But to keep this book free from error was part of the cashier's work, and the responsibility for having it so kept was upon him, and until some failure on his part in that respect had been brought to their notice the directors might reasonably assume that this part of his work was being properly done, without giving it their personal supervision.

On December 3, 1909, the next examination of the bank by a national examiner was made. By that time the deposit totals had further declined to $151,506.30, a decline since the June examination which must have attracted the examiner's notice. Yet neither in his report, nor to the directors, did he suggest that anything had been found by him requiring correction or investigation, in the bank's condition at that time. Though they knew that his examination was by no means a complete audit, the circumstance that he had found nothing wrong might justly tend to confirm the directors in their reliance upon the cashier.

[10] 5. The defendant Barber has been found negligent by the District Court, in that he paid no attention to certain statements made to him, about three months before the bank failed, by the president of the Harvard Trust Company, in an interview at which they talked about the proposed purchase of the bank. The statements were, in substance, that it had been currently reported among Bullard's clerks that one of the bank's officers was frequenting bucket shops in Boston and was evidently living pretty fast. No name was mentioned; Barber did not ask the name, never reported the statement to the other directors, and took no steps to investigate as to their truth.

Barber, so far as appears, had at the time no other reason for suspecting that Coleman might be the person intended, except that during the preceding summer a Dr. Wetherbee, living near the bank, had told him "he did not think it looked very well to have the automobile in front of the bank so much." Barber's testimony, given in person before the master, was that Bullard's statements directed his mind, not to Coleman (who was only the bookkeeper), but to the officers of the bank. This seems to us the impression most likely to be given by what Bullard said. He did not suggest any belief of his own that the reports he referred to were true, or even that they called for action on Barber's part. In view of Barber's testimony, we cannot consider it proved that they constituted a warning against Coleman which Barber could not neglect without becoming responsible.

Various other questions are raised by the assignments of error, which the conclusions above stated render it unnecessary to decide.

The decree of the District Court, except as against Edwin Dresser's administrator, is reversed. The case is remanded to that court, with directions to dismiss the bill as against the other defendants, and to modify the decree against said administrator by reducing the damages awarded to the amount of Coleman's defalcations from December 1, 1908, to the close of the bank. So modified, said decree is affirmed. The appellants recover their costs of appeal.

BROWN, District Judge (dissenting in part). While I fully agree with the careful opinion of the majority of the court as to the defendants other than the administrator of Edwin Dresser, I am unable to agree with a finding that by reason of special negligence on the part of Edwin Dresser his estate should be held responsible in damages to to full amount of Coleman's defalcations from December 1, 1908, to the close of the bank.

I am especially of the opinion that what may be termed the "Fillmore warning" has been given undue and artificial importance as a notice putting Edwin Dresser on guard against Coleman as an untrustworthy person, whose conduct should have been brought to the attention of the other directors and made a subject of investigation.

The special master, experienced in judicial work, had before him the witnesses in person, and upon this matter, depending so much upon oral testimony and upon the circumstances under which Fillmore's statement was made, found no negligence. I am of the opinion that this finding of the master should stand.

The testimony of Mr. Wellington Fillmore, who was a depositor in the bank up to the time that it closed its doors, is chiefly relied upon as a direct warning to Dresser. The following extracts from Fillmore's testimony are referred to. They relate to a brief conversation with Dresser on the street:

"I told him that it was very evident there was a thief in the bank; that the money had been stolen. I said, 'I would advise you to look after Coleman, for I believe that he is living a pretty fast pace, and I have pretty good authority for believing that he is supporting a woman.' That is about what I said to him."

Upon cross-examination he testified:

"X-Q. 3. Give the whole of that conversation again.  A. I said to him it was very evident there was a thief at the bank; that I was satisfied that my package had been stolen, and advised him to make inquiries about Coleman; that I believed he was living a pretty fast pace, and I was informed by pretty good authority that he was supporting a woman.

"X-Q. 4. Is that the whole of it?  A. Well, I told him who my authority was; I told him who had told me what Coleman was doing.

"X-Q. 5. How long was the conversation?  A. About three minutes.

"X-Q. 6. He was waiting to take the car, was he?  A. Yes, sir.

"X-Q. 7. He made no reply?·  A. No; he made no reply. It might have been a five minutes' talk."

From this testimony it appears that the charge that there was a thief in the bank related to the disappearance of a special package containing $150, which Fillmore had left with Davis, a former cashier, for safe-keeping some 15 years before, and which could not be found. It had no relation to any business of the bank, or to any matter of accounts or of bookkeeping, or to the disappearance of any funds of the bank.

There is no evidence that Coleman had anything to do with the disappearance of this box, and he denied that he did, though testifying freely as to his defalcations. There appears no sufficient ground for Dresser's accepting Fillmore's conclusion that the box had in fact been stolen, and that for this reason there was, at the time of this conversation, "a thief in the bank," or that Coleman was a just object of suspicion on that account.

There is, however, evidence in the record of doubt in Dresser's mind as to the facts. Fillmore testified that Dresser, in a previous conversation, had asked him if Fillmore had a receipt for the box, that he replied that he had not, and that Dresser wanted to know why he did not put it in the savings bank. There is no evidence that Dresser had any personal knowledge of the existence of the box; and Earl, the cashier, testified that he did not remember seeing a box that answered the description of the one that Fillmore testified to as being lost.

The expression, there is "a thief in the bank," made in this connection, contained no suggestion or implication of Fillmore's knowledge of the abstraction of any funds of the bank. It suggested suspicion of Coleman, based upon disappearance of the package. How far Fillmore's grounds of suspicion of a theft were the basis of the advice to look after Coleman, and what weight Dresser should have

attached to Fillmore's suspicion of theft and of Coleman as a thief, were questions peculiarly for a master who heard the oral testimony, as was also the question of what weight Dresser should have attached to the accompanying statement of Fillmore's belief that "he is living a pretty fast pace," and of his "pretty good authority that he is supporting a woman."

This brief street conversation, which is now given such grave importance, was preceded by a formal letter from Fillmore to Dresser, as president, dated September 29, 1908, and relating to the loss of the package; a matter which was not new at the bank, but which previously had been under discussion with Dresser, with Earl, the cashier, and the subject of correspondence with Davis, the former cashier, with whom the package had been left many years before.

Though in his letter Fillmore says that the package was once handed to him, "I think by Mr. Earl," Earl testified that he did not remember seeing a box that answered the description of the one Fillmore testified to as being lost. Whether the box had ever been in Earl's possession, or had disappeared during the time of Coleman's employment at the bank, rather than during a previous period of eight years, is a matter of dispute upon the briefs.

But, whatever the fact, there was at least substantial reason for doubt in Dresser's mind as to the justice of Fillmore's grounds for suspicion of Coleman, and as to their weight.

The letter concludes as follows:

"While the National City Bank may not be legally bound to make this loss good, at the same time I consider it under moral obligation to reimburse me for this loss. As I never had it in my hands but at the times above-mentioned, and never removed it from the bank, I can come to but one conclusion: That it has been destroyed or removed by some one connected with the bank. I hope you will bring this matter before the board of directors of your bank, and inform me of the result at as early a date as convenient."

In this formal communication Fillmore makes no charge of theft, and no allusion to Coleman, and suggests no suspicion of him. The matter which he desires to be brought before the board of directors, and to be informed of the result, is a request for reimbursement of $150.

Fillmore received no reply to this request, and had no further conversation with Dresser, except the short street conversation above set forth.

That there was neglect by Dresser of the bank's interest in not submitting this request for reimbursement to the board of directors does not appear. If the letter could be regarded as notice of a loss of a package, this might have led to a further inquiry as to that loss. Such inquiry, so far as appears, would have amounted to nothing, and would not have affected Coleman; certainly there was no reason for examining the books of the bank in this connection.

Nor does the street conversation gain any weight when coupled with this letter. On the contrary, when preparing a formal communication for the consideration of the board of directors, Fillmore makes no charge or implication of theft by any one, and, though a de-

positor, gives the president for communication to the board of directors no hint of his suspicion of Coleman or his mode of life, and suggests no inquiry.

After the lapse of about a month without a response to his request, and upon a casual meeting on the street, in a very brief conversation he first suggests his suspicions of Coleman. At no time, either by his letter or orally, did he suggest bringing before the board the question of an inquiry into Coleman's conduct.

That Fillmore's suspicions were of serious weight, even with himself, seems doubtful from the fact that he did not withdraw his deposit, but, like Dresser, remained a depositor in the bank until it closed.

To take the statement, "there is a thief in the bank," away from its connection with the unexplained disappearance of Fillmore's package of $150 at some indefinite date, a matter having no connection with the business and books of the bank, and to convert it into a warning connected with a great loss of $300,000, more or less, through an unprecedented manipulation of the credits and books of the bank, seems unjustifiable. An inquiry into this matter, which already had been inquired into, would not naturally have led to an investigation of Coleman's bookkeeping.

Should Fillmore's statement, not of facts, but of suspicions, have led to an investigation of Coleman's life out of the bank?

It should not be left out of account that Coleman was daily at the bank, where he was under observation of Dresser, and especially of Earl, the cashier. He was well behaved, industrious, and courteous, and was well liked. There was no evidence that he was criticized by any one in the bank because of anything in his conduct or bearing. He was known to be the son of a reputable father, who was in business in Cambridge, and a man of some financial standing.

How far Dresser's own knowledge of Coleman, and his judgment from personal observation of Coleman, justified him in attaching no weight to Fillmore's suspicions, is especially a question of fact upon which the master, who had Coleman under close observation as a witness, as he did also the other witnesses who testified as to Coleman's conduct, was much better qualified than judges who have only a printed record. That Dresser had complete confidence in Coleman is manifest. That this confidence was not in fact disturbed by Fillmore's statement is manifest. Should it have been? Our own knowledge of men constantly leads us to discredit and instantly reject rumors and suspicions concerning them. There is no rule of law that determines when it is reasonable and when it is unreasonable to do so. The master has found in favor of Edwin Dresser upon this point.

The practical rules which determine the weight to be attached to a master's report are especially applicable on just such a question as this, and for sound reasons weigh heavily in favor of this defendant.

It was not unnatural that Dresser should have regarded the advice to look after Coleman as based principally upon the disappearance of the box. The record does not contain an explanation by Dresser

of his reasons for attaching no weight to Fillmore's statement of his suspicions. At the time of Dresser's examination he testified that he was born December 16, 1826, was 87 years old, and during the last 2½ years preceding his testimony had been sick most of the time, and that he had not the slightest recollection of Fillmore's telling him that there was a thief in the bank, or of sending him a letter. As the master found Fillmore a credible witness, the lack of explanation by Dresser was presumably due to a natural failure of memory during the period following the closing of the bank. But the fact that Dresser was the largest depositor in the bank, and that the bank's interests and his own were to so great an extent identical, as well as the testimony as to his regular business habits, seem inconsistent with a reckless disregard of notice of any actual fact brought to his attention affecting the trustworthiness of the employés of the bank.

If Dresser erred in considering all that Fillmore said as a mere incident to his claim for reimbursement for the loss of the package, and should have made inquiry into the statement as to Coleman's supporting a woman, the inquiry would probably have led then, as it did later, to the explanation that the woman was engaged to Coleman, that she had occasionally called at the bank, and that she was a "ladylike and well-appearing young woman."

Another and distinct "warning" is found in Coleman's ownership of an automobile—"A clerk at $12 a week with an automobile!" Like the expression, "There's a thief in the bank," this is given a false value, if dissociated from the rest of the facts.

The master had before him evidence that Coleman, after bank hours, was engaged in the automobile business, had sold a number of automobiles, one to a director of the bank; that the young man, though working at a small salary, lived at home with his father, who was reputed to be of good financial standing, and the testimony of a witness who said that Coleman's father was reputed wealthy and that it did not surprise him to see the son have an automobile; also testimony that the price of the automobile—$800—was paid for in part by commissions on sales of other machines, and that Coleman made no concealment of the machine, but invited persons connected with the bank, including Dresser, to ride with him.

There is also meager evidence that Coleman had discussed copper stocks with Dresser. The master specifically found that Dresser had no knowledge that Coleman was speculating in stocks, and it is evident that a contrary finding, or a finding that Dresser had reasonable cause to suspect Coleman of stock gambling, could not justly be based upon the very meager evidence on this point.

It seems erroneous to assume that all of these so-called warnings, or grounds for suspicion, were ever assembled in Edwin Dresser's mind in the form in which they are assembled in the appellee's brief.

We should also take into full account the fact that the cashier, Earl, as executive officer of the bank (Merchants' Bank v. State Bank, 10 Wall. 604, 650, 19 L. Ed. 1008), had full opportunity to observe Coleman, and that Dresser was reasonably entitled to rely greatly

upon Earl's observation of Coleman, and upon his discovery of any apparent irregularities in his conduct.

We are not informed that any of the bank's money was spent upon Coleman's automobile, or upon a woman whom he was supporting, or to what extent, if at all, it was spent in stock gambling.

Upon the theory that the principal negligence was the failure of the directors to make such examinations of the books as were required of them, this might perhaps have been regarded as a subordinate matter. But upon the reversal of the District Court on this point the question how far the loss of the bank's money was in fact due to matters of which Dresser had notice enough to put him on inquiry seems of special importance.

If it be conceded that the proofs are sufficient to show that Edwin Dresser was negligent in failing to heed warnings of Coleman's untrustworthiness, and if we apply the rule that notice sufficient to put one on inquiry is notice of everything to which inquiry might have led, this, in my opinion, should lead not to the affirmance of the judgment against Dresser for the full amount of Coleman's defalcations, but rather to sending the case back to the District Court for a reassessment of damages.

The plaintiff's evidence fails to show to what extent Coleman's appropriation of the bank's funds was due to any of the matters of which it is claimed Dresser had notice.

It must be borne in mind that this is not an action of tort. In view of the decision of the District Court that the action against Dresser's administrator survives because the cause of action is ex contractu rather than ex delicto (229 Fed. ·798), there is special force in the defendant's argument that the liability is only for such loss as was the natural and probable consequence of negligence, and which ought to have been foreseen in the light of attending circumstances. Negligence is a failure to take reasonable precautions against that which is reasonably to be apprehended.

This case presents the remarkable feature that there was no reasonable cause for apprehension that a bank could be reduced to a mere shell by the unprecedented method adopted by Coleman. It is also remarkable, in that the causes which led to such large misappropriations by Coleman were in a great part equally outside the bounds of reasonable anticipation. That this large loss of the bank was due to any causes operating upon Coleman which, upon the most favorable view of the plaintiff's evidence, should have been investigated is not proved in this record, which, though it sets forth slight evidence concerning the purchase of stocks, extravagances in mode of life, etc., is yet very meager as to the causes which led Coleman to his large defalcations.

In considering, however, the question whether the present judgment should be affirmed, or whether the case should be sent back for further proceedings to determine the damages, we cannot indulge in any presumption that the matters in respect to which negligence is charged were the causes which led him to ruin the bank. We cannot disregard the fact that, from our own records and from the reported decision of

this court, there appears explanation as to the disposition by Coleman of the bank's funds, and as to the causes which led him to such disposition, which destroys any presumption that the bank's losses were wholly due to matters in respect to which the defendant Dresser was negligent, and shows that they were due principally to an unprecedented combination of circumstances in which third parties intervened with a scheme for making Coleman a conduit for conveying to them the bank's funds, and for despoiling Coleman as well as the bank—a scheme of third parties in which Coleman was but the cat's-paw.

If Coleman had associated himself with a band of burglars, and admitted them to blow the safe locked against him, it would seem quite clear that this would be so remote a cause of loss that the defendant Dresser could not be responsible for it by reason of the evidence in this case.

We cannot ignore the fact that upon the records of this court is something quite analogous to such a case, and it is not improper, in the interests of justice, to take judicial cognizance of facts appearing upon our own records and of great notoriety in this community, although, of course, we give weight to these only upon the question of affirmance or retrial of the question of damages. In Keliher v. United States, 193 Fed. 8, 12, 114 C. C. A. 128, appears the following:

"Therefore the United States, proved by Coleman, apparently without objection, that he misapplied approximately $211,000 on and after the 2d day of June, 1909, and that of this amount all but a sum not exceeding in the whole $50,000 was lost through his connection with the plaintiff in error"— i. e., Keliher.

In Spade v. Lynn & Boston Rd., 168 Mass. 285, 47 N. E. 88, 38 L. R. A. 512, 60 Am. St. Rep. 393, it is said:

"Rules of law respecting the recovery of damages are framed with reference to the just rights of both parties; not merely what it might be right for an injured person to receive, to afford just compensation for his injury, but also what it is just to compel the other party to pay."

A court of equity called upon to measure a just compensation for breach of a contractual duty is not required to apply the rule of damages applicable in cases of wanton or willful wrong. The damage to be recovered should be the natural and proximate consequence of the act complained of, and those results considered proximate which the wrongdoer from his position must have contemplated as the probable consequence of his breach of contract. Smith v. Bolles, 132 U. S. 125, 130, 10 Sup. Ct. 39, 33 L. Ed. 279; Globe Refining Co. v. Landa Cotton Oil Co., 190 U. S. 540, 23 Sup. Ct. 754, 47 L. Ed. 1171; Pollock on The Law of Torts (10th Eng. Ed.) pp. 582, 583; Id. p. 41; Milwaukee & St. Paul R. R. Co. v. Kellogg, 94 U. S. 467, 475, 24 L. Ed. 256; Atchison, etc., Ry. Co. v. Calhoun, 213 U. S. 1, 7, 29 Sup. Ct. 321, 53 L. Ed. 671.

That Coleman, a bookkeeper constantly under the supervision of a cashier, and whose fidelity bond was fixed at the sum of $5,000, as a reasonable measure of the risks incident to his position, would have either the opportunity or the temptation to do what the appellee's brief characterizes as "the seemingly impossible," was far outside

the bounds of reasonable foresight. I know of no authority which visits upon one who has failed in the performance of a contractual duty damages beyond the limits of what reasonably ought to have been foreseen, or which condemns him in damages to the extent of what is "seemingly impossible."

I feel constrained to dissent on the grounds:

First. That the master's report should be adopted, and should not be set aside.

Second. That, assuming negligence as found by the majority, the amount of damages is not justified by the evidence.

### On Motion to Amend Decree.

ALDRICH, District Judge. The motion to amend the decree of this court of March 5, 1918, by adding the words "interest on the said amount to run from February 1, 1916, the date of the final decree in said District Court," is denied.

[11, 12] Rule 30 of this court (150 Fed. xxxv, 79 C. C. A. xxxv) and rule 23 of the Supreme Court (32 Sup. Ct. xi) are the same as to interest upon judgments below in actions at law. These rules, however, in their ordinary sense, are understood to apply to judgments which are affirmed in toto, and not necessarily to judgments which are modified in substantial respects.

In equity the rule likewise applies, in terms, only to decrees which are affirmed, and not to substantially modified decrees. But, recognizing the idea of the existence of inherent discretion, the general rule in equity that interest shall be calculated upon decrees which are affirmed is subject to the important qualification that it may be otherwise ordered. It being thus assumed, by such express qualification, that reasons may exist which would make it inequitable to allow interest, even where the decree is in all respects affirmed, it may safely be assumed, we think, that more and stronger reasons may be found for doing the same thing, where the decree below is not affirmed in full, or in fact, but subjected to substantial modifications under a decretal order which directs how the modifications shall be made, and which, by its terms, becomes operative as an affirmance only upon the modified creation. Under such circumstances, the plaintiff's right to recover is not established by the original decree, but by a modified one, upon which the affirmance operates when the modification is made as directed.

It is probably quite correct to say, especially in equity cases, that it is reasonably within the realm of discretion—in cases where the recovery relates to unliquidated damages and to situations where recovery is not for money misappropriated and used by the defendant, but where he is sought to be charged upon the ground of negligence or the wrongdoing of another, and where the appeal is not for delay, but prosecuted in good faith upon substantial and close lines of controversy in respect to liability—for the court to say, if it finds equitable grounds for saying it, that interest ought to follow, or that it ought not to follow, and this without regard to whether the decree is affirmed in whole or in part. Steel Co. v. New York City

R. R., 198 Fed. 778, 779, 780, 117 C. C. A. 560; Tire Co. v. Rubber Co. (D. C.) 232 Fed. 508; De La Rama v. De La Rama, 241 U. S. 154, 159, 36 Sup. Ct. 518, 60 L. Ed. 932, Ann. Cas. 1917C, 411.

The decision here did not hold Edwin Dresser for the amount decreed below, nor did it hold him upon the ground that he was negligent and liable in respect to the whole period covered by the District Court. The directed decree and the modified recovery are based upon only a part of the time covered by the findings and the decree of the District Court. Consequently, in quite a substantial sense the directed decree will become an original one, and the plaintiff's right of recovery is thus to be established by a decree which is to be made in accordance with the mandate of this court based upon different facts and different findings than those involved in the first decree of the District Court.

The District Court says nothing about interest. Neither does the decree of this court.

The reason for not allowing interest in equity, and under such circumstances, resides largely in the fact that the damages are unliquidated and must, in a sense, remain so until liquidated under the directions of the mandate; and it is because of this that the liquidated sum, as finally ascertained, is often adopted as the amount for which the right of recovery should be established through the instrumentality of the directed decree. The view that damages, as finally ascertained and decreed, often become the amount of recovery, and that interest, something in the nature of damages, remains in abeyance until the right is established by the decree, in accordance with the mandate is accepted by the Supreme Court as so far conclusive that it is said that, where the decree of the appellate court does not expressly carry interest, none can be awarded by the court to which the decree is directed. Himely v. Rose, 5 Cranch, 313, 316, 3 L. Ed. 111; Boyce v. Grundy, 9 Pet. 275, 289, 290, 9 L. Ed. 127; In re Railroad Co., 140 U. S. 91, 96, 11 Sup. Ct. 673, 35 L. Ed. 339.

There would seem to be no principle upon which to ground interest upon unliquidated damages, or upon judgments and decrees for unliquidated damages, until they are determinate in every substantial sense.

Interest upon judgments and decrees which are affirmed is upon the idea that they were fixed and distinct muniments of right which the appellate court approves, as something which should stand, not only in substance, but in terms. Where a decree is modified or reconstructed upon different lines, the right was not defined and established by an original judgment or decree, but is defined and established by another, a later, and a different muniment; consequently the reason for interest upon affirmed judgments and decrees does not exist in the latter circumstances. Doubtless the directed decree might be so closely like the original one as to justify an order for interest upon equitable grounds, but it would not come under any rule of strict right.

Where the right of interest is not established by contract, by statute, or by judgment, it ordinarily comes as an allowance in the nature

of damages, based upon use or wrongful detention. Pike v. Gregory, 118 Fed. 128, 129, 55 C. C. A. 78; United States v. North Carolina, 136 U. S. 211, 216, 10 Sup. Ct. 920, 34 L. Ed. 336.

On the whole, and under the circumstances of this case, we incline to the view that there are no sufficient equitable reasons for allowing interest upon the unliquidated damages which resulted from losses, the amount of which is to be hereafter ascertained, in order that the measure of the plaintiff's right of recovery may be known and established by a modified decree to be hereafter formulated by the District Court.

Where damages are unliquidated, there is usually no interest until the right to the principal is established or, in other words, until judgment or decree. It is understood that when the District Court has made the ascertainments directed by the decree of this court of March 5, 1918, and entered a decree thereon, that the decree of March 5 will then operate in affirmance thereof and as of the date of its entry. It is not, however, in fact, an affirmance of the old decree, but of the reconstructed one. It was not intended in any other sense. It is one of those, not unusual, cases where certain things are directed to be done, and when done, the decree of affirmance, though earlier, is made to operate upon the perfected condition, without again coming to the appellate court.

Judge BROWN, having dissented on the main question of liability, takes no part in the decision of this question.